[Cite as *In re J.C.S.*, 2023-Ohio-1511.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

|                    |   |                                      |
|--------------------|---|--------------------------------------|
| IN RE: J.C.S.      | : |                                      |
|                    | : |                                      |
|                    | : | C.A. No. 29690                       |
|                    | : |                                      |
|                    | : | Trial Court Case No. G-2016-007513-  |
|                    | : | 0N,0R                                |
|                    | : |                                      |
|                    | : | (Appeal from Common Pleas Court-     |
|                    | : | Juvenile Division)                   |
|                    | : |                                      |

. . . . . . . . . . .

O P I N I O N

Rendered on May 5, 2023

. . . . . . . . . . .

MATHIAS H. HECK, JR., by MICHAEL P. ALLEN, Attorney for Appellee

ROBERT ALAN BRENNER & MARY ADELINE R. LEWIS, Attorneys for Appellant Mother

. . . . . . . . . . . . .

WELBAUM, P.J.

{¶ 1} Mother appeals from a judgment of the Montgomery County Court of Common Pleas, Juvenile Division, which terminated her parental rights and granted permanent custody of her 16-year-old daughter, J.C.S., to Montgomery County Children Services ("MCCS"). Father, whose parental rights were also terminated by the

judgment, did not file an appeal, but filed an "appellee" brief in which he argues that MCCS did not make sufficient efforts to serve him with notice of the permanent custody proceedings. For the reasons outlined below, the trial court's judgment granting MCCS permanent custody of J.C.S. will be affirmed.

**Facts and Course of Proceedings**

{¶ 2} On January 25, 2017, the trial court adjudicated J.C.S. an abused, neglected, and dependent child based on allegations of substance abuse by Mother and Mother's home being unclean and smelling of cat urine. Following the adjudication, the trial court granted temporary custody of J.C.S. to her maternal uncle and ordered the temporary custody to expire on December 9, 2017.

{¶ 3} Prior to the expiration of the temporary custody order, MCCS sought to have Mother and J.C.S. reunified. Therefore, on August 4, 2017, MCCS moved the trial court to grant legal custody of J.C.S. to Mother with protective supervision to MCCS. In support of its motion, MCCS filed an affidavit averring that Mother had made great progress on her case plan and had maintained a safe, stable home environment for her children. On November 14, 2017, the trial court granted Mother legal custody of J.C.S. with protective supervision by MCCS until May 16, 2018.

{¶ 4} Two years after MCCS's protective supervision expired, MCCS became involved with Mother again after she was arrested for endangering children on July 23, 2020. The charges arose after Dayton Police officers were called to Mother's home and observed that the home was in a deplorable condition and that Mother's children needed

medical care. The home reportedly had a foul smell with dog and cat feces lying around. Parts of the home also contained rotten food. It was also reported that J.C.S.'s younger half-sibling was frail and suffering from a bowel obstruction and a toenail condition that required surgery.

{¶ 5} After Mother's arrest, on August 31, 2020, MCCS sought temporary custody of J.C.S. or, alternatively, to a non-relative, Kathy Hoover.[1] MCCS also requested a shelter care hearing. Following the shelter care hearing, the trial court granted interim temporary custody of J.C.S. to MCCS and thereafter granted temporary custody to Hoover until August 31, 2021.

{¶ 6} Prior to the expiration of Hoover's temporary custody, on May 3, 2021, MCCS requested a first extension of temporary custody to MCCS. In support of the motion, MCCS reported that Hoover had indicated that J.C.S. had too many appointments for her to manage and that caring for J.C.S. was a greater demand than she had expected. MCCS also reported that Hoover's husband advised that their family's finances were depleted and that he was not willing to continue having custody of J.C.S. after the current school year.

{¶ 7} MCCS further reported in its motion that Mother had not made significant progress on her case plan, was noncompliant with her mental health and addiction treatment, was unemployed, and relied on her boyfriend to pay her expenses. In addition, MCCS reported that Mother had been charged with operating a vehicle while under the influence in December 2020 and had told the arresting officer that she wanted

---

[1] Kathy Hoover is the paternal grandmother of J.C.S.'s younger half-sibling.

to kill herself. MCCS also reported that on April 21, 2021, Mother left a voicemail calling J.C.S. derogatory names.

{¶ 8} On May 7, 2021, the trial court granted MCCS interim temporary custody of J.C.S., and it granted MCCS temporary custody on November 9, 2021. Approximately two months later, MCCS filed for permanent custody of J.C.S. The trial court held hearings on the permanent custody motion on February 14 and April 27, 2022, which included testimony from MCCS caseworkers Tasjanea Bivens and Valerie Tucker and from Mother.

{¶ 9} The testimony established that Bivens was the initial caseworker assigned to J.C.S.'s case and served as the ongoing caseworker until the case was transferred to Tucker on April 5, 2022. Bivens testified that while in MCCS's temporary custody, J.C.S. had a history of absconding from her foster placements. Bivens testified, however, that J.C.S. had not absconded from her most recent placement at Foundations for Living, a residential treatment facility for adolescents. Bivens testified that when she last spoke with J.C.S. in February 2022, J.C.S. was doing well at Foundations for Living. Specifically, J.C.S. was taking her medication, attending school intermittently, and receiving services for her mental health needs.

{¶ 10} Tucker testified that as of April 14, 2022, J.C.S. was still doing well at Foundations for Living. According to Tucker, J.C.S. had been attending school, receiving mental health and substance abuse treatment, and working toward her release from Foundations for Living. Tucker testified that the plan was to secure a permanent placement for J.C.S. when she was released from Foundations for Living. Tucker stated

that J.C.S. had indicated a desire to contact Father when she was released but never mentioned wanting to contact Mother or any other individual. Bivens similarly testified that when she last spoke with J.C.S., J.C.S. had reported that she did not want to go back with Mother but wanted to go with Father. Bivens testified that if MCCS were granted permanent custody of J.C.S., the case would be transferred to the agency's adoption unit, which would engage in recruitment and matching efforts for J.C.S. to be adopted.

{¶ 11} Regarding Mother and Father, Bivens testified that MCCS had made efforts to assist them in overcoming the barriers that led to J.C.S.'s removal from their care. Specifically, Bivens testified that MCCS had created a case plan for the family, in which Father did not want to participate. According to Bivens, Father had indicated that he did not want to be a part of the case and did not want to reunify with J.C.S. Tucker also testified that since taking over the case, she had had no contact with Father.

{¶ 12} Bivens testified that Mother's case plan objectives included obtaining housing and income, completing mental health and alcohol and drug assessments, meeting with her children regularly, attending doctor's appointments for her children, and taking parenting classes. When Bivens had last spoken with Mother in February 2022, Mother did not have safe and appropriate housing suitable for herself or J.C.S. In addition, Mother had not had any verifiable income that was sufficient to support her and J.C.S.'s needs. Bivens also testified that Mother had not completed an alcohol and drug assessment but allegedly had completed a mental health assessment through a church. Bivens testified, however, that Mother had provided no verification of the mental health assessment and noted that MCCS typically does not accept mental health assessments

from community resources such as churches.

{¶ 13} Mother testified that she had told Bivens that she had started receiving mental health treatment at Butler Behavioral Health in Middletown and had given Bivens her therapist's information. Mother admitted, however, that she never signed a release of information for that facility.

{¶ 14} In addition to Mother's failure to obtain housing and income and to complete the aforementioned assessments, Bivens testified that Mother had not been consistently meeting with her children and had lost contact with MCCS for nine months in 2021. According to Bivens, J.C.S. had absconded from her foster placement during that nine-month period and was found to be staying with Mother. Bivens also testified that Mother had not consistently attended J.C.S.'s doctor's appointments and had not completed an approved parenting class. To assist with the parenting class objective, MCCS referred Mother to classes at Samaritan Behavioral Healthcare, South Community Inc., and Eastway Behavioral Healthcare.

{¶ 15} Bivens testified that Mother was not an appropriate placement for J.C.S. because Mother and J.C.S.'s relationship was rocky and because Mother was unable to provide J.C.S. with safe, stable housing. Bivens stated that she did not believe Mother and J.C.S. could reunify within a reasonable period of time because Mother was incarcerated at that time and still needed to build a bond with J.C.S.

{¶ 16} With regard to Mother's incarceration, Mother testified that at the time of the hearing, she was serving a six-month term at West Central Community Correctional Facility ("West Central") with a projected release date of July 28, 2022. Mother testified

that her incarceration had resulted from her pleading guilty to a charge of failure to appear at court in Champaign County after she had been charged with felony drug possession. Mother testified that, while at West Central, she had completed an alcohol and drug assessment and had started taking parenting and substance abuse classes. Mother also testified to starting a treatment plan. However, Mother confirmed that when she was eventually released from West Central, she would still need to obtain housing and income.

{¶ 17} Tucker testified that Mother's completion of the programs at West Central was a good start but that it would take Mother a considerable amount of time to secure housing and employment, to maintain her sobriety, and to follow through with treatment. Tucker indicated that once Mother was released from West Central, it could take as long as two years for Mother to reach those goals, and that Mother had a history of not following through with services and failing to cooperate with MCCS.

{¶ 18} With regard to J.C.S.'s placement, Bivens testified that Mother had identified her two brothers and a nonrelative, Hoover, as possible placements for J.C.S., but that none of those placements worked. Bivens testified that Mother's brothers reported that they could not care for J.C.S. because of her mental health issues. According to Bivens, Mother did not identify any other family members, other than Father, that might be available to take custody of J.C.S.

{¶ 19} In contrast, Mother claimed that Bivens had not asked her about family members who could care for J.C.S. and that her family had not been contacted by MCCS. Mother also claimed that her own mother and two of her cousins would be willing to take

J.C.S.   Bivens testified, however, that every case goes through an MCCS program that locates relatives for possible placement, and that no other willing, able, and appropriate relative was found for J.C.S.   Tucker also confirmed that MCCS had completed the relative search before filing its motion for permanent custody on January 13, 2022.

{¶ 20} Bivens testified that granting MCCS permanent custody would be in J.C.S.'s best interest because it would provide J.C.S. with a safe home environment and allow J.C.S. to have her mental health needs met.   Tucker similarly testified that granting MCCS permanent custody would allow J.C.S. to have a permanent family that could provide for her needs and invest in her treatment and education.

{¶ 21} J.C.S.'s guardian ad litem ("GAL") also attended the permanent custody hearing and submitted a report that recommended granting permanent custody to MCCS. The GAL's report indicated that J.C.S. had been earning various rewards in the Foundations for Living program and was scheduled to be released from the program in two months.   The GAL's report confirmed that J.C.S. did not wish to have any contact with Mother but was open to having contact with Father.   The report further indicated that J.C.S. did not have any objection to the motion for permanent custody but was not interested in being adopted.   Instead, J.C.S. had advised the GAL that she would like to be placed with her older brother when he was emancipated from Mother.

{¶ 22} After considering the testimony presented at the permanent custody hearing, on May 31, 2022, the presiding trial court magistrate issued a decision granting MCCS's motion for permanent custody.   Mother thereafter filed objections and supplemental objections pursuant to Juv.R. 40(D)(3)(b).   After independently reviewing

the record, the trial court judge issued an order overruling Mother's objections and granting MCCS permanent custody of J.C.S.

{¶ 23} Mother now appeals from the trial court's judgment, raising a single assignment of error for review. Father did not appeal from the permanent custody judgment but filed an "appellee" brief raising an argument regarding notice of the permanent custody proceedings.

**Mother's Assignment of Error**

{¶ 24} Under her sole assignment of error, Mother contends that the trial court erred by granting MCCS permanent custody of J.C.S. Specifically, Mother argues that awarding MCCS permanent custody was not in J.C.S.'s best interest. We disagree.

*General Standards*

{¶ 25} "The United States Supreme Court has stated that parents' interest in the care, custody, and control of their children 'is perhaps the oldest of the fundamental liberty interests recognized by this Court.' " *In re B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, ¶ 19, quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000). The Supreme Court of Ohio has also "long held that parents who are 'suitable' have a 'paramount' right to the custody of their children." *Id.*, quoting *In re Perales*, 52 Ohio St.2d 89, 97, 369 N.E.2d 1047 (1977). (Other citations omitted.) "Permanent termination of parental rights has been described as 'the family law equivalent of the death penalty in a criminal case.' * * * Therefore, parents 'must be

afforded every procedural and substantive protection the law allows.' " *In re Hayes*, 79 Ohio St.3d 46, 48, 679 N.E.2d 680 (1997), quoting *In re Smith*, 77 Ohio App.3d 1, 16, 601 N.E.2d 45 (6th Dist.1991).

**{¶ 26}** That said, " 'the natural rights of a parent are not absolute, but are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.' " *In re Cunningham*, 59 Ohio St.2d 100, 106, 391 N.E.2d 1034 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla. App.1974). Therefore, "parental interests are subordinate to the child's interest when determining the appropriate resolution of a petition to terminate parental rights." *B.C.* at ¶ 20, citing *Cunningham* at 106.

**{¶ 27}** "[T]he [trial] court's decision to terminate parental rights will not be overturned if the record contains competent, credible evidence by which the court could have formed a firm belief or conviction that the essential statutory elements for a termination of parental rights have been established." (Citation omitted.) *In re E.D.*, 2d Dist. Montgomery No. 26261, 2014-Ohio-4600, ¶ 7. "On review, we give the trial court's final determination 'the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned.' " *In re G.B.*, 2d Dist. Greene No. 2017-CA-30, 2017-Ohio-8759, ¶ 8, quoting *In re Alfrey*, 2d Dist. Clark No. 2001-CA-83, 2003-Ohio-608, ¶ 102. Accordingly, the trial court's decision will not be reversed absent an abuse of discretion. *E.D.* at ¶ 7, citing *In re C.F.*, 113 Ohio St.3d 73, 2007-Ohio-1104, 862 N.E.2d 816, ¶ 48 (applying abuse-of-discretion standard to trial court's findings under R.C. 2151.414).

*R.C. 2151.414 Analysis*

**{¶ 28}** R.C. 2151.414, the statute that governs the termination of parental rights in Ohio, provides a two-part test for courts to apply when determining whether to grant a motion for permanent custody to a public services agency. The statute requires the trial court to find by clear and convincing evidence that: (1) any one of the factors enumerated in R.C. 2151.414(B)(1)(a) through (e) exist; and (2) an award of permanent custody to the agency is in the child's best interest. R.C. 2151.414(B)(1).

(1) Existence of Factor Under R.C. 2151.414(B)(1)(a) through (e):

**{¶ 29}** In awarding permanent custody to MCCS, the trial court determined that the factor under R.C. 2151.414(B)(1)(a) existed in this case. That factor provides, in relevant part: "The child is not abandoned or orphaned, has not been in the temporary custody of one or more public services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period, * * * and the child cannot be placed with either of the child's parent's within a reasonable time or should not be placed with the child's parents." R.C. 2151.414(B)(1)(a). When examining whether the child cannot be placed with the child's parents within a reasonable time or should not be placed with either parent, the court must consider "all relevant evidence" and determine "by clear convincing evidence" whether one or more factors listed under R.C. 2151.414(E)(1) through (E)(16) exists. R.C. 2151.414(E). If there is clear and convincing evidence showing that one or more of the factors under R.C. 2151.414(E) exist, the trial court must "enter a finding that the child cannot be placed with either parent within a reasonable time

or should not be placed with either parent." R.C. 2151.414(E). In this case, the trial court determined that the factors under (E)(1), (E)(4), and (E)(10) existed by clear and convincing evidence.

{¶ 30} Factor (E)(1) provides: "[N]otwithstanding reasonable case planning and diligent efforts by the agency to assist the parent to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home." R.C. 2151.414(E)(1). In this case, the record indicates that MCCS attempted to assist Mother in reunifying with J.C.S. by providing a case plan, case management, home study, and referrals. Despite this, Mother continually failed to complete her case plan objectives and only began engaging in parenting and substance abuse classes and drug and alcohol assessments since being incarcerated at West Central in March 2022. Despite MCCS's diligent efforts, the record indicates that Mother continued to struggle with the same issues that led to J.C.S.'s initially removal from her care in 2017 and that Mother had repeatedly failed to substantially remedy those issues. Accordingly, the trial court's finding under R.C. 2151.414(E)(1) was not an abuse of discretion.

{¶ 31} Factor (E)(4) provides: "The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child." R.C. 2151.414(E)(4). In this case, the record indicates that Father had not had contact with J.C.S. throughout the case, did not want to work on

a case plan, and had no desire to reunify with J.C.S. The record also indicates that Mother had continually failed to provide a safe, stable home for J.C.S. and had not had consistent contact with J.C.S. throughout the case. Although it was reported that Mother and J.C.S. spoke on the phone and were briefly together when J.C.S. absconded from her foster placement in 2021, the record indicates that Mother did not consistently visit J.C.S. Accordingly, the trial court's finding under R.C. 2151.414(E)(4) was not an abuse of discretion.

{¶ 32} Factor (E)(10) provides that: "The parent has abandoned the child." R.C. 2151.414(E)(10). Upon review, we find that the application of factor (E)(10) would mean that the trial court improperly applied R.C. 2151.414(B)(1)(a), because (B)(1)(a) applies when: "*The child is not abandoned* or orphaned, has not been in the temporary custody of one or more public services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two month period, * * * and the child cannot be placed with either of the child's parent's within a reasonable time or should not be placed with the child's parents." (Emphasis added.) R.C. 2151.414(B)(1)(a). This court has explained that the (B)(1)(a) factor applies when none of the other factors under (B)(1) are triggered. *See In re H.L.R.*, 2d Dist. Montgomery No. 28894, 2021-Ohio-229, ¶ 16. The factor under subsection (B)(1)(b) is triggered when "[t]he child is abandoned." R.C. 2151.414(B)(1)(b). That said, the trial court's error in finding both that (B)(1)(a) applied and that J.C.S. had been abandoned was harmless error; the trial court's finding that J.C.S. had been abandoned satisfied the factor under (B)(1)(b) and in turn satisfied the requirement that one of the factors under R.C. 2151.414(B)(1)(a) through (e) exist.

**{¶ 33}** Upon review, we find that the record contains competent, credible evidence from which the trial court could have clearly and convincingly found that J.C.S. had been abandoned. Under Chapter 2151 of the Revised Code, "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." R.C. 2151.011(C). Here, the record indicates that at the time MCCS filed its motion for permanent custody, J.C.S. had had no contact with either of her parents for over 90 days. *See* GAL reports from July 20, 2021, October 7, 2021, and February 8, 2022, indicating that J.C.S. had had no contact with her parents). The record also indicates that MCCS lost contact with Mother for nine months in 2021 and that Father did not have any contact with MCCS in 2021 and did not wish to reunify with J.C.S.

**{¶ 34}** For the foregoing reasons, the requirement that any one of the factors under R.C. 2151.414(B)(1)(a) through(e) exist was satisfied.

(2) Best Interest Determination:

**{¶ 35}** Pursuant to R.C. 2151.414(D)(1), when determining whether an award of permanent custody to a public services agency is in a child's best interest, the trial court is required to consider all relevant factors, including but not limited to, the following:

    (a)    The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers and any other person who may significantly affect the child;

(b)     The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c)     The custodial history of the child, including whether the child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period;

(d)     The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; and

(e)     Whether any of the factors in R.C. 2151.414(E)(7) through (11) are applicable.

R.C. 2151.414(D)(1)(a)-(e).   Like the findings under R.C. 2151.414(B) and (E), the trial court's findings under R.C. 2151.414(D)(1) must be supported by clear and convincing evidence.   *In re K.W.*, 2d Dist. Clark No. 2013-CA-107, 2014-Ohio-4606, ¶ 7.

{¶ 36} In this case, the record establishes that the trial court considered all the factors under R.C. 2151.414(D)(1) and determined that it was in J.C.S.'s best interest to grant MCCS permanent custody.   Based on the following, we find that there was clear and convincing evidence in the record to support that finding.

*(a) J.C.S.'s Interaction and Interrelationship with Parents and Foster Caregivers*

{¶ 37} The record establishes that Mother and J.C.S. have had a tumultuous

relationship and that J.C.S. did not want to have any contact with Mother. The record also establishes that Mother did not consistently visit J.C.S. after J.C.S. was removed from her care. Although J.C.S. expressed interest in having contact with Father, Father had had no contact with J.C.S. throughout the case and did not wish to reunify with her. As for J.C.S.'s foster placement at the time of the hearing, the record indicates that J.C.S. had been doing well at Foundations for Living and was participating in the program's treatment services.

**{¶ 38}** This factor weighed in favor of granting permanent custody to MCCS.

### (b) J.C.S.'s Wishes

**{¶ 39}** The GAL reported that J.C.S. was not interested in being adopted but did not have any objection to MCCS's motion for permanent custody. J.C.S. had expressed to the GAL that she would like to be placed with her older brother once he was emancipated from Mother. J.C.S. also expressed that she did not wish to have any contact with Mother but was open to having contact with Father, who, as previously noted, did not wish to be a placement option.

**{¶ 40}** This factor weighed in favor of granting permanent custody to MCCS.

### (c) Custodial History

**{¶ 41}** The record indicates that at the time MCCS filed its motion for permanent custody, J.C.S. had not been in the temporary custody of one or more public children services agencies or private child placing agencies for 12 or more months of a

consecutive 22-month period.[2]   On January 25, 2017, J.C.S. was placed in the temporary custody of her maternal uncle.   On November 14, 2017, J.C.S. and Mother were reunified with MCCS having protective supervision until May 16, 2018.   On August 31, 2020, J.C.S. was placed in the interim temporary custody of MCCS.   On October 30, 2020, interim temporary custody was granted to Kathy Hoover.   Thereafter, Hoover was granted temporary custody on December 16, 2020.   On May 7, 2021, MCCS was granted interim temporary custody due to Hoover's issues with caring for J.C.S.   MCCS was thereafter granted temporary custody on November 9, 2021, and then filed for permanent custody two months later on January 13, 2022.

{¶ 42} The foregoing custodial history indicates that J.C.S. had been placed in and out of various custody arrangements for multiple years, which weighed in favor of granting permanent custody to MCCS.

*(d) Child's Need for Legally Secure Placement*

{¶ 43} Bivens's and Tucker's testimony established that J.C.S. needed a permanent, safe home that could provide for her needs and invest in her mental health treatment and education.   The record indicates that Father was unwilling to be a permanent placement for J.C.S. and that Mother had repeatedly failed to show that she could adequately support and care for J.C.S.   The record also indicates that MCCS attempted to place J.C.S. with other family members and a nonrelative without success.

---

[2] "[T]he time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count toward the 12-month period[.]"   *In re C.W.*, 104 Ohio St.3d 163, 2004-Ohio-6411, 818 N.E.2d 1176, ¶ 26.

Specifically, Hoover was unable to maintain care of J.C.S., and Mother's brothers were unwilling to care for J.C.S. due to her mental health issues.

{¶ 44} Although Mother identified her own mother and two of her cousins as possible placements for J.C.S. at the permanent custody hearing, the record indicates that Mother had never previously identified those individuals as possible placements and that MCCS had otherwise conducted a relative search and found no willing, able, and appropriate relative to care for J.C.S. In addition, both caseworkers testified that granting MCCS permanent custody was in J.C.S.'s best interest because it would provide her with a permanent home and the assistance and treatment that she required. The GAL also recommended permanent custody be granted to MCCS and concluded that "permanent custody is the only option for [J.C.S.]"

{¶ 45} This factor weighed in favor of granting permanent custody to MCCS.


*(e) Applicability of Factor R.C. 2151.414(E)(10)*

{¶ 46} As previously discussed, factor (E)(10) provides that: "The parent has abandoned the child." R.C. 2151.414(E)(10). Because we already determined that the record indicates Mother and Father abandoned J.C.S. as defined in R.C. 2151.011(C), this factor also weighed in favor of granting permanent custody to MCCS.

{¶ 47} Based on the foregoing analysis, we find that the record contained competent, credible evidence from which the trial court could have clearly and convincingly found that all the best-interest factors under R.C. 2151.414(D)(1) weighed in favor of granting MCCS permanent custody of J.C.S. Accordingly, the trial court did

not abuse its discretion in finding that an award of permanent custody to MCCS was in J.C.S.'s best interest.

{¶ 48} Because the record contains competent, credible evidence satisfying both parts of the two-part test in R.C. 2151.414(B)(1), the trial court did not err by granting permanent custody to MCCS.

{¶ 49} Mother's sole assignment of error is overruled.

**Father's Notice Argument**

{¶ 50} As previously discussed, Father filed an "appellee" brief in which he challenged the trial court's judgment on grounds that MCCS had not made sufficient efforts to serve him with notice of the permanent custody proceedings. Specifically, Father claims that MCCS failed to exercise reasonable diligence when it chose to serve him by publication without first attempting to serve him by certified mail. In doing so, Father suggests that MCCS denied him due process of the law.

{¶ 51} The notice issue raised by Father is not properly before this court because Father did not file a notice of appeal challenging the trial court's permanent custody judgment. *See* App.R. 3; *In re E.S.*, 9th Dist. Lorain No. 18CA011259, 2018-Ohio-3929, ¶ 7; *In re C.P.*, 2d Dist. Clark No. 2017-CA-48, 2018-Ohio-1862, ¶ 3 and ¶ 11. However, even if Father had properly raised the notice issue on appeal, it would still fail.

{¶ 52} "[C]ourts have long recognized that due process requires both notice and an opportunity to be heard." (Citations omitted.) *In re Thompkins*, 115 Ohio St.3d 409, 2007-Ohio-5238, 875 N.E.2d 582, ¶ 13. "When the state seeks to interfere with a

parent's liberty interest in the care, custody, and management of his or her child, the Due Process Clause requires the state to 'attempt to provide actual notice' to the parents." (Emphasis omitted.) *In re J.T.*, 2019-Ohio-465, 129 N.E.3d 946, ¶ 32 (4th Dist.), quoting *Thompkins* at ¶ 14, citing *Dusenbery v. United States*, 534 U.S. 161, 170, 122 S.Ct. 694, 151 L.Ed.2d 597 (2002). "Due process does not, however, require the state to undertake ' "heroic efforts" ' to provide actual notice" and "does not require that a parent receives actual notice before the state may permanently sever the parent-child relationship." *Id.*, quoting *Thompkins* at ¶ 14, quoting *Dusenbery* at 170. "Instead, the state satisfies its due process obligation to provide notice and an opportunity to be heard if the state employs means that are 'reasonably calculated' to inform the parent of the proceeding involving his or her child." *Id.*, quoting *In re A.G.*, 139 Ohio St.3d 572, 2014-Ohio-2597, 13 N.E.3d 1146, ¶ 64. In doing so, "the state must exercise 'reasonable diligence in attempting to notify [parents] that [their] parental rights [are] subject to termination.' " *Id.*, quoting *Thompkins* at ¶ 15. (Other citation omitted.)

**{¶ 53}** Generally speaking, the procedures set forth in Chapter 2151 of the Ohio Revised Code protect the due process rights of parents facing the termination of their parental rights. *Id.* at ¶ 35, citing *B.C.*, 141 Ohio St.3d 55, 2014-Ohio-4558, 21 N.E.3d 308, at ¶ 25-27. R.C. 2151.414(A)(1) provides, in relevant part, that when a motion for permanent custody is filed, "the court shall schedule a hearing and give notice of the filing of the motion and of the hearing, in accordance with section 2151.29 of the Revised Code, to all parties to the action and to the child's guardian ad litem."

**{¶ 54}** "For proper service [under R.C. 2151.29], the parents must be notified of

the permanent custody motion and the initial permanent custody hearing by one of three methods: personal service, service by certified or registered mail * * *, or—if both those methods fail—by publication." *In re Keith Lee P.*, 6th Dist. Lucas No. L-03-1266, 2004-Ohio-1976, ¶ 8, citing R.C. 2151.29 and Juv.R. 16. "Afterwards, constructive notice of hearings is proper." *Id.*, citing *In re Billingsley*, 3d Dist. Putnam Nos. 12-02-07, 12-02-08, 2003-Ohio-344, ¶ 8-10. (Other citations omitted.) *Accord In re C.B.*, 2020-Ohio-5151, 161 N.E.3d 770, ¶ 15 (4th Dist.). Service by publication " 'is reserved for those cases in which the residence of the parent is unknown and is not ascertainable with reasonable diligence.' " *J.T.*, 2019-Ohio-465, 129 N.E.3d 946, at ¶ 38, quoting *In re R.P.*, 9th Dist. Summit No. 26271, 2012-Ohio-4799, ¶ 18. It has been described as " 'a method of last resort.' " *Id.*, quoting *In re Miller*, 33 Ohio App.3d 224, 226, 515 N.E.2d 635 (8th Dist.1986).

{¶ 55} In this case, the record establishes that MCCS attempted to personally serve Father with notice of the initial permanent custody hearing that took place on February 14, 2022. The process server, however, was unable to serve Father and filed a return of service stating that: "I was unable to serve a copy of this summons and accompanying document(s) upon [Father] for the following reasons: Several attempts to serve, cards removed. [Father's] wife called * * * and advised he told MCCS he wants nothing to do [with] the case."

{¶ 56} After Father refused personal service, MCCS went through the process of having Father served by publication. The record indicates that the publication was posted on January 25, 2022, through February 1, 2022. *See* Hearing Tr. (Apr. 27, 2022),

p. 5.   Thereafter, Father's counsel appeared at the February 14 permanent custody hearing on Father's behalf.   Father, however, did not attend the hearing.   There is nothing in the record indicating that Father's counsel objected to the method of service used by MCCS or argued that Father had not had notice of the hearing.

{¶ 57} Following the February 14 hearing, the trial court scheduled a second permanent custody hearing for April 27, 2022.   The record indicates that notice of the April 27 hearing was sent to Father via certified mail on February 24, 2022; however, it is unclear whether the notice was successfully served on Father.   Despite this, Father's counsel appeared at the April 27 hearing without Father.   During the hearing, Father's counsel once again failed to raise any objection regarding service.   Instead, Father's counsel stated the following at the hearing: "I did communicate with Father by e-mail, he had no problem waiving any defects in service, and has otherwise indicated a desire not to participate in today's proceedings."   Hearing Tr. (Apr. 27, 2022), p. 6.

{¶ 58} While MCCS may not have strictly complied with the statutory requirements for service when it chose to serve Father with the initial hearing notice by publication before attempting service by certified mail, Father waived any argument to that effect given that his counsel appeared at all the permanent custody hearings and raised no issue regarding service or notice.   Indeed, "[t]he issue of notice is waived on appeal when the parent's attorney is present for various permanent custody hearings and never argues improper notice."   *Lee P.*, 6th Dist. Lucas No. L-03-1266, 2004-Ohio-1976, at ¶ 9, citing *Billingsley,* 3d Dist. Putnam Nos. 12-02-07, 12-02-08, 2003-Ohio-344, at ¶ 10.   *Accord In re I.G.*, 3d Dist. Marion Nos. 9-13-43, 9-13-44, 9-13-45, 2014-Ohio-1136, ¶ 18; *In re*

*D.H.*, 177 Ohio App.3d 246, 2008-Ohio-3686, 894 N.E.2d 364, ¶ 38 (8th Dist.).

{¶ 59} Furthermore, when Father's counsel appeared at the final permanent custody hearing, counsel advised the trial court that he had communicated with Father and that Father had told him that he did not want to participate in the hearing and waived any defects in service. "A parent's attorney's statement to the court that he or she communicated with the parent, who failed to appear, proves that the parent had constructive notice of the permanent custody hearing." *C.B.,* 2020-Ohio-5151, 161 N.E.3d 770, at ¶ 16, citing *In re Brodzenski*, 5th Dist. Stark No. 1997CA00412, 1998 WL 753190 (Oct. 26, 1998); *Accord Lee P.* at ¶ 8. Therefore, in addition to waiving any defects in service, counsel's remarks at the final hearing indicate that Father had, at the very least, constructive notice of the proceedings.

{¶ 60} Because the notice argument in Father's filing was not properly raised on appeal, and because the record establishes that Father waived any issue regarding notice and otherwise had constructive notice of the permanent custody proceedings, Father's notice argument is without merit.

## Conclusion

{¶ 61} The judgment of the trial court granting MCCS permanent custody of J.C.S. is affirmed.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.