[Cite as *In re A.W.*, 2025-Ohio-5657.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

| | | |
|---|---|---|
| IN RE: A.W., C.W., S.W., D.W., B.W., R.W. | : | C.A. No. 30519 |
| | : | |
| | : | Trial Court Case Nos. C-2022-002510-0N; C-2022-002511-0N; C-2022-002512-0N; C-2022-002513-0N; C-2022-002514-0N; C-2022-002516-0O |
| | : | |
| | : | (Appeal from Common Pleas Court-Juvenile Division) |
| | : | |

**FINAL JUDGMENT ENTRY & OPINION**

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on December 19, 2025, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

ROBERT G. HANSEMAN, JUDGE

EPLEY, P.J., and HUFFMAN, J., concur.

OPINION

KELLY M. SCHROEDER, Attorney for Appellant, Father
SARAH H. CHANEY, Attorney for Appellee, Montgomery County Children Services

HANSEMAN, J.

{¶ 1} Father appeals from a judgment of the Juvenile Division of the Montgomery County Common Pleas Court that terminated his parental rights and granted permanent custody of his children, A.W., C.W., S.W., D.W., B.W., and R.W., to the Montgomery County Department of Job and Family Services – Children Services Division ("MCCS"). For the reasons outlined below, the trial court's judgment granting MCCS permanent custody of the children is affirmed.

**Facts and Course of Proceedings**

{¶ 2} On June 16, 2022, MCCS received a referral indicating that A.W., C.W., S.W., D.W., B.W., R.W., and H.W. ("the children") were living in deplorable housing conditions and that Mother and Father were abusing drugs. MCCS conducted a home visit and observed cockroaches throughout the home, unsuitable beds for the children, and a lack of adequate food. When Mother and Father were asked to submit to a drug screen they both admitted to using cocaine and marijuana. In light of these circumstances, the children were removed from the home by the Dayton Police Department, and MCCS was granted ex parte emergency custody.

{¶ 3} The day after the children were removed from their home, MCCS filed a complaint alleging that the children were neglected and dependent. One week later, the trial court granted a kinship caretaker, Dorthea Willis, interim temporary custody of the two oldest

children, R.W. and H.W. The other five children were placed in the interim temporary custody of MCCS. MCCS placed D.W. and B.W. together in a foster home and placed A.W., C.W., and S.W. together in a different foster home.

{¶ 4} R.W. and H.W. were with Willis for about a month before Willis decided that she was no longer willing to care for them. As a result, on July 27, 2022, the trial court terminated the order granting Willis interim temporary custody of R.W. and H.W. and granted MCCS interim temporary custody. After leaving Willis's care, R.W. and H.W. were placed in separate group homes.

{¶ 5} On September 2, 2022, the trial court adjudicated the children dependent after Mother and Father had stipulated to the facts alleged in the dependency complaint. Because Mother and Father failed to remedy the concerns that had led to the removal of the children, on October 28, 2022, the trial court granted MCCS temporary custody of the children until July 7, 2023. By May 2023, Mother and Father had not made any progress on remedying the concerns that had led to the removal of the children, and MCCS filed a motion for permanent custody on May 11, 2023.

{¶ 6} After MCCS filed for permanent custody, the children's guardian ad litem ("GAL") filed a report on May 23, 2023, indicating that R.W., H.W., and S.W. wanted to go home to Mother and Father. Because the GAL did not believe that going home to Mother and Father was in the children's best interest, the GAL recommended the trial court appoint separate counsel to represent R.W., H.W., and S.W. In light of the GAL's recommendation, the trial court assigned separate counsel to those children.

{¶ 7} The hearing on MCCS's motion for permanent custody was initially scheduled to occur on November 30, 2023. Two weeks before that date,15-year-old H.W. died as the result of a shooting incident that occurred while H.W. was on her way to school. In light of

3

H.W.'s tragic death, MCCS agreed to proceed with requesting a first extension of temporary custody as opposed to permanent custody. The trial court granted the requested extension, which was ordered to run until January 7, 2024.

{¶ 8} The circumstances that had led MCCS to file for permanent custody remained unchanged, so MCCS filed a second motion for permanent custody on December 13, 2023. On March 21, 2024, the trial court held a hearing on the motion. Father attended the hearing with his counsel. The respective counsel for R.W. and S.W. attended the hearing as well. Mother did not attend the hearing, but she was represented by counsel who did attend.

{¶ 9} At the beginning of the hearing, Mother's counsel moved for a continuance due to Mother's absence. Along with this request, Mother's counsel disclosed that he had spoken with Mother on March 2, 2024, and confirmed that he had made Mother aware of the hearing date. MCCS caseworker Jill Bradley also indicated that she had spoken with Mother on or near March 11th or 14th and had made Mother aware of the hearing date. Counsel for MCCS advised the trial court that certified mail service on Mother's last known address had failed but that MCCS had obtained service on Mother by publication. Mother's counsel did not object to MCCS's advisement regarding service on Mother.

{¶ 10} After Mother's counsel moved to continue the hearing, Father, through his counsel, also moved for a continuance. Father's counsel argued that a continuance would allow Father to complete his substance abuse treatment program and continue working toward reunification. The trial court found that Mother's and Father's requested continuances were made outside the time frame provided by the court's local rules. The trial court also found that Mother and Father had not presented exceptional circumstances warranting a finding of good cause to grant a continuance on the day of the hearing. Accordingly, the trial court denied their requested continuances, and the hearing went forward as scheduled.

{¶ 11} During the hearing, MCCS presented testimony from the caseworker assigned to Mother and Father's case, Jill Bradley. MCCS also presented testimony from the two foster mothers who had been caring for A.W., C.W., S.W., D.W., and B.W. The following is a summary of the testimony elicited during the permanent custody hearing.

*Caseworker Bradley's Testimony Regarding Mother and Father*

{¶ 12} In August 2022, Bradley was assigned to Mother and Father's case and provided them with a case plan to facilitate reunification with their children. Bradley went over the case plan with Mother and Father and ensured that they understood the plan's objectives. The case plan required Mother and Father to submit to substance abuse and mental health assessments within 30 days of signing the case plan. It also required Mother and Father to follow all recommendations from those assessments. In addition, the case plan required Mother and Father to display appropriate parenting skills while visiting the children, complete a parenting class, maintain sobriety, obtain and verify income, obtain and maintain a stable living environment and appropriate housing for the children, sign all releases of information, and meet with Bradley on a regular basis.

{¶ 13} Bradley testified that Mother and Father had signed all releases of information, but had not completed any of the other case plan objectives. According to Bradley, Mother and Father did not follow through with her initial referral for substance abuse and mental health assessments and never sought any mental health counseling. Bradley claimed that every time she met with Father, he admitted to using drugs and alcohol. On February 6, 2023, Bradley had Father submit to a random drug screen when he came to MCCS for visitation. Bradley identified the corresponding results of the drug screen and testified that the results established that Father had tested positive for THC and cocaine. Bradley added

5

that Mother had admitted to regularly using cocaine and alcohol, but explained that Mother mainly struggled with alcohol abuse.

{¶ 14} After Father tested positive for THC and cocaine, Bradley made a second referral for Mother and Father to obtain substance abuse and mental health assessments. Both Mother and Father, however, failed to follow through with that referral. Bradley testified that she discussed several inpatient, outpatient, and detox treatment programs with Mother and Father and gave them a list of all the service providers within the Montgomery County area. Bradley noted that Mother and Father never followed through with any of those programs.

{¶ 15} Bradley testified that on February 29, 2024, approximately a month before the permanent custody hearing, Father had entered an inpatient facility for drug abuse in Dayton, Woodhaven Residential Treatment Center ("Woodhaven"). Bradley explained that the Woodhaven inpatient program usually lasted 30 to 90 days, but that its duration ultimately depended on the individual. To Bradley's knowledge, Father had been sober since his admission to Woodhaven.

{¶ 16} Bradley indicated that Mother did not enter Woodhaven with Father but was residing somewhere in Arkansas. Bradley explained that Mother and Father had been evicted from their residence in April 2023 and that they had left Ohio for Arkansas sometime in June 2023. According to Bradley, Father came back to Ohio and entered Woodhaven because his Medicaid would not work in Arkansas.

{¶ 17} Bradley claimed that Father had told her that he and Mother had been living with his father ("Paternal Grandfather") and Mother's sister while they were in Arkansas. After learning this information, Bradley contacted Child Protective Services in Arkansas in an attempt to locate Mother. According to Bradley, the Arkansas agency visited the home of

6

Mother's sister, but the residents of the home advised that Mother and Father did not live there. Bradley testified that the Arkansas agency was unable to contact Paternal Grandfather because during that period, she did not have a good address for him.

{¶ 18} As for visitation, Bradley indicated that MCCS gave Mother and Father the opportunity for weekly visits with the children. Bradley shared that Mother and Father's visits with the children were very sporadic. Bradley claimed that visitation went well for a couple of weeks, but by August 2022, Mother and Father had begun missing and canceling visits at the last minute due to alleged issues with transportation. After this started happening, Bradley provided Mother and Father with bus passes. Despite this, Bradley claimed that Mother and Father still continued to attend visits sporadically.

{¶ 19} Bradley testified that before Mother and Father had moved to Arkansas, their last visit with the children was on May 15, 2023. Mother and Father did not see the children again until H.W.'s funeral on December 8, 2023. Bradley indicated that Mother and Father had some unmonitored telephone contact with 13-year-old R.W. while they were in Arkansas, as R.W. had his own phone. However, Mother and Father did not have any contact with the other children.

{¶ 20} Bradley recounted that she had referred Mother and Father to parenting classes at the Triple P Parenting Program. Bradley claimed that Mother and Father had told her that they were going to contact Catholic Social Services instead. However, to Bradley's knowledge, Mother and Father never followed through with contacting any parenting class provider. Although Father told Bradley that Mother had been engaging in a parenting program in Arkansas, Bradley testified that she never received verification of Mother's participation in a parenting program.

7

**{¶ 21}** Bradley explained that Mother and Father had failed to demonstrate appropriate parenting skills because of their lack of visits with the children. When Mother and Father did visit the children, Bradley claimed that they would engage in inappropriate conversations. Bradley recalled Mother and Father saying negative things about MCCS to the children and telling the children that they would be coming home soon, which gave the children a false hope of reunification.

**{¶ 22}** Aside from these failures, Bradley testified that Mother and Father had not obtained stable income despite MCCS providing them with job referral services. Bradley said that Mother and Father had told her that they were employed at certain fast food restaurants, but they never provided her with verification of that employment. In addition, Bradley observed that Mother and Father had not obtained or maintained suitable housing for the children because they were allegedly living with family members in Arkansas.

**{¶ 23}** With regard to relatives who could potentially care for the children, Bradley testified that Mother and Father had proposed Paternal Grandfather as a possible caretaker. Bradley, though, explained that Paternal Grandfather was not a viable option because his health was failing and because he wanted to take only R.W. Bradley shared that MCCS also had contacted a cousin whom Mother and Father identified as a possible caretaker. But the cousin was not willing to take the children because they had already formed a bond with their foster families. Mother and Father also provided Bradley with the name of a maternal cousin or aunt. Bradley explained this woman was not viable option because she was already caring for children who belonged to her sister.

**{¶ 24}** Bradley testified that MCCS also contacted the children's maternal grandmother ("Maternal Grandmother"), who resides in Mississippi. Bradley indicated that MCCS had offered to make arrangements for Maternal Grandmother to fly out and visit the

8

children since she had never met them before. Bradley claimed that Maternal Grandmother never followed through with visiting the children. Accordingly, Bradley testified that she was unaware of any willing, able, and appropriate relative who could care for the children.

{¶ 25} Bradley testified that if MCCS was awarded permanent custody of the children, the agency would pursue adoption of the children by their foster mothers. Bradley explained that the foster mothers had sufficient space for the children and were addressing all the children's needs. Bradley also testified that there is a positive bond between the foster mothers and the children and that there were no barriers to either of the foster mothers adopting the children. Bradley testified that although R.W. was in a group home and not a foster placement, he was still adoptable and that MCCS would seek an adoptive placement for him.

{¶ 26} Lastly, Bradley testified that she believed reunification was not possible in the foreseeable future given that Mother and Father had continually failed to complete their case plan objectives for almost two years despite receiving multiple referrals and other assistance from MCCS. Bradley testified that Father's admission to Woodhaven and his newfound sobriety did not change that determination given that he would have to maintain his sobriety for six months before MCCS could consider reunification. Bradley added that MCCS would also have to consider the fact that Father has not met any of his other case plan objectives. Bradley testified that it would not be possible for Mother or Father to meet those objectives within the necessary time frame. For that reason, Bradley testified that MCCS believed awarding it permanent custody was in the best interest of the children.

*Caseworker Bradley's Testimony Regarding R.W.*

{¶ 27} Bradley testified that R.W. was placed with a kinship caregiver for about a month after he was removed from his parents' care. Bradley indicated that the kinship

caregiver no longer wanted to care for R.W. due to his delinquent behavior. As a result, R.W. was placed in Dante's Peak, a group home. Bradley explained that R.W. was eventually removed from Dante's Peak because he was going "AWOL" by leaving the facility and returning to his parents' residence.

{¶ 28} After R.W. was removed from Dante's Peak, he was placed in several other group homes in Cincinnati. Bradley testified that R.W. had recently been placed back into Dante's Peak. According to Bradley, R.W. has a bond with the owner of Dante's Peak. Bradley believed R.W. looks to the owner as a mother or grandmother figure. Bradley explained that at that time, the owner of Dante's Peak was not in a position to consider adopting R.W., but would consider long-term placement and possibly adoption when she is able to focus solely on R.W. and less on her own family.

{¶ 29} Bradley testified that R.W. has a very low I.Q. of 54 and was in an individualized education program ("IEP") that required a lot of one-on-one instruction. Bradley said that R.W. had been diagnosed with severe attention-deficit/hyperactivity disorder ("ADHD"), post-traumatic stress disorder ("PTSD"), and adjustment disorder. Bradley shared that R.W. had indicated that he feels much better while on his medication, which included Vyvanse, Risperdal, melatonin, and Glucophage.

{¶ 30} Bradley noted that R.W. had received counseling from the Urban Minority Alcoholism and Drug Abuse Outreach Program ("UMADAOP"). Bradley testified that R.W.'s special needs were being addressed and that he was in the process of enrolling in further counseling. Bradley indicated that she had seen significant improvement in R.W. since H.W.'s death. Bradley had observed R.W. become a big-brother role model to his younger siblings. Bradley testified that R.W. loves his siblings and his parents but that he was aware that his parents had not been doing what was necessary to reunite the family.

{¶ 31} D.W. and B.W. had been with their foster mother ("Foster Mother") since they were removed from their parents' home on June 16, 2022. Foster Mother testified that she had been caring for D.W. since he was five years old and B.W. since she was two years old. At the time of the permanent custody hearing, D.W. was seven years old and in the first grade, and B.W. was four years old and in preschool.

{¶ 32} Foster Mother testified that she has three of her own children, who at the time were aged 17, 15, and 10. Foster Mother explained that B.W. shared a room with her 10-year-old daughter and that D.W. had his own room. According to Foster Mother, D.W. and B.W. got along with all her children. D.W. and B.W. also had a positive, loving relationship with their foster siblings' grandparents, whom D.W. and B.W. considered to be their own grandparents.

{¶ 33} Foster Mother testified that D.W.'s and B.W.'s needs were being met in her care. Foster Mother indicated that D.W. and B.W. were up to date on their shots and that D.W. had dental issues for which she had obtained treatment. Foster Mother also indicated that B.W. was still being potty trained and was seeing a pediatrician for that issue. The pediatrician was also treating D.W. for asthma.

{¶ 34} Foster Mother testified that D.W. had an IEP and that B.W. was in the process of being placed on an IEP for behavioral and cognitive delay. Foster Mother claimed that when she had first received D.W., he could not spell or write his name, but he had become proficient at those tasks, as well as addition, multiplication, and subtraction. Foster Mother also described B.W.'s abilities to count and to use some sign language.

{¶ 35} Foster Mother testified that Mother and Father had not visited D.W. or B.W. regularly and that the children had not asked about Mother or Father. Foster Mother advised

11

that the children did not have a relationship with or bond with Mother or Father, but that they did have a bond with their older siblings. According to Foster Mother, D.W. and B.W. got to visit their siblings A.W., C.W., and S.W. at least once or twice a month. In addition, Foster Mother said that D.W. and B.W. got calls and visits from R.W. Foster Mother testified that she had grown close to D.W. and B.W., and that she would like to adopt them if MCCS were granted permanent custody.

*Testimony of A.W., C.W., and S.W.'s Foster Mother*

{¶ 36} A.W., C.W., and S.W. had been with their foster mother ("Foster Mother") since they were removed from their parents' home on June 16, 2022. Foster Mother testified that at the time of the hearing, A.W. was eleven years old, C.W. was nine years old, and S.W. was eight years old. Foster Mother reported that all three children had been doing well in school since being removed from their parents' care. Foster Mother testified that A.W. and S.W. had IEPs for reading, writing, and math, and that C.W. was doing well without an IEP. Foster Mother indicated that C.W. had been diagnosed with severe PTSD and ADHD, for which she was taking Vyvanse. Foster Mother also testified that S.W. had been diagnosed with depression but was not taking any medication.

{¶ 37} According to Foster Mother, the children went to therapy every Monday and saw their school counselor as needed to help them with the passing of H.W. Foster Mother testified that A.W., C.W., and S.W. were close with H.W., and that H.W.'s death had affected them more than their younger siblings. Foster Mother said that counseling through a trauma-based therapist had been helpful. Foster Mother claimed that the children had been dealing with trauma issues even before H.W. died, indicating that the children often screamed, cried, threw things, and wet the bed.

{¶ 38} Foster Mother testified that she has a 15-year-old son and that her son had a sibling bond with A.W., C.W., and S.W. According to Foster Mother, the children had also bonded to her extended family. Foster Mother indicated that her sister lived three streets away and had four kids who went to the same school and daycare as A.W., C.W., and S.W. Foster Mother shared that the families celebrate holidays together and have sleepovers.

{¶ 39} Foster Mother also reported that the children spent time with their siblings D.W. and B.W. at least once or twice a month. Foster Mother testified that she and the foster mother of the other siblings had taken the children to go bowling, visit parks and playgrounds, and eat pizza or McDonald's together. Foster Mother added that she had taken all the children Easter egg hunting. Foster Mother indicated that the children got to talk to their older brother R.W. on the phone and saw him once a month at Children Services. Foster Mother indicated that A.W., C.W., and S.W. were bonded to R.W.

{¶ 40} Foster Mother testified that she did not have much communication with Mother and Father. Foster Mother claimed that Mother sent her messages on Facebook Messenger about once a month. Foster Mother also claimed that Mother had called her a couple of weeks before the permanent custody hearing. Foster Mother testified that during the call, Mother had said things that did not make sense, which led her to believe that Mother may have been intoxicated. Foster Mother indicated that before that call, Mother had not attempted to contact the children since H.W.'s funeral in December 2023.

{¶ 41} Foster Mother explained that Mother had absolutely no contact with A.W., C.W., or S.W. between May 2023 and December 2023. She further testified that Mother and Father had not let the children know that they were moving to Arkansas, nor had they said goodbye to the children before leaving. Foster Mother claimed that prior to their last visit with the children, Mother and Father had visited the children only once or twice a month. Foster

13

Mother recalled that when Mother and Father visited the children, they sometimes arrived late or only one of them showed up to the visit.

{¶ 42} Foster Mother indicated that A.W., C.W., and S.W. did not ask about Mother and Father and did not request to see them. Foster Mother testified that after the children interacted with Mother and Father at H.W.'s funeral they began having tantrums, meltdowns at school, and issues with bed wetting that lasted for weeks. Foster Mother indicated that she loves A.W., C.W., and S.W. just as much as she loves her own son and that she would do anything for them. Foster Mother confirmed that she would want to adopt A.W., C.W., and S.W. if MCCS were granted permanent custody.

*GAL's Recommendation*

{¶ 43} On March 15, 2024, the children's GAL filed a report that was submitted as an exhibit during the permanent custody hearing. In the report, the GAL indicated that R.W. wanted to live with either his parents or Paternal Grandfather and that the other children were settled in their foster placements and wished to remain there. The GAL recommended that it was in the children's best interest to award MCCS permanent custody.

*Permanent Custody Decision*

{¶ 44} After considering the testimony and evidence presented at the permanent custody hearing, on April 1, 2024, the presiding magistrate issued a decision granting MCCS permanent custody of the children. Father and Mother filed timely objections to the magistrate's decision. Father objected to the magistrate's decision on several grounds, including that Mother was not properly served with notice of the permanent custody hearing. Father also argued that the magistrate erred by finding that it was in the best interest of the children to grant MCCS permanent custody. Mother objected to the magistrate's best-

14

interest finding as well, but she did not present any specific arguments or reasoning in support of her objection. She also did not make any arguments regarding service.

{¶ 45} After independently reviewing the record, on June 2, 2025, the trial court judge issued an order granting MCCS's motion for permanent custody and overruling Father's and Mother's objections to the magistrate's decision. Father now appeals from that judgment and raises three assignments of error for review. For purposes of clarity, we address Father's assignments of error out of order.

**Third Assignment of Error**

{¶ 46} Under his third assignment of error, Father claims that the trial court erroneously determined that granting MCCS permanent custody was in the best interest of the children. Father argues that he was on track to accomplish his goal of sobriety and that maintaining the integrity of the family was in the best interest of the children. Father claims that the trial court should have granted MCCS a second extension of temporary custody as opposed to permanent custody. We disagree.

*Standards of Review*

{¶ 47} The standards that apply in reviewing decisions on the permanent custody of children and the termination of parental rights are sufficiency of the evidence and manifest weight of the evidence. *In re Z.C.*, 2023-Ohio-4703, ¶ 1. "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id*. at ¶ 14, citing *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 20. "In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact." *Eastley* at ¶ 21.

15

{¶ 48} In contrast, a review for the sufficiency of the evidence involves testing the adequacy of the evidence and determining, as a matter of law, whether the evidence is legally sufficient to sustain a judgment. *Z.C.* at ¶ 13, citing *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997). "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when "'the evidence is legally sufficient to support the [judgment] as a matter of law.'"" *Bryan-Wollman v. Domonko*, 2007-Ohio-4918, ¶ 3, quoting *Thompkins* at 386, quoting *Black's Law Dictionary* (6th Ed. 1990).

{¶ 49} "'Although sufficiency and manifest weight are different legal concepts, manifest weight may subsume sufficiency in conducting the analysis; that is, a finding that a [judgment] is supported by the manifest weight of the evidence necessarily includes a finding of sufficiency.'" (Bracketed text in original.) *In re Adoption of L.B.R.*, 2019-Ohio-3001, ¶ 19 (2d Dist.), quoting *State v. McCrary*, 2011-Ohio-3161, ¶ 11 (10th Dist.). "As a result, 'a determination that a [judgment] is supported by the weight of the evidence will also be dispositive of the issue of sufficiency.'" (Bracketed text in original.) *Id.*, quoting *State v. Braxton*, 2005-Ohio-2198, ¶ 15 (10th Dist.).

### *R.C. 2151.414*

{¶ 50} R.C. 2151.414 governs the termination of parental rights in Ohio. It provides a two-part test for courts to apply when determining whether to grant a motion for permanent custody to a public services agency. The statute requires the trial court to find by clear and convincing evidence that (1) any one of the factors enumerated in R.C. 2151.414(B)(1)(a) through (e) exist, and (2) an award of permanent custody to the agency is in the best interest of the child. R.C. 2151.414(B)(1).

{¶ 51} With regard to the factors under (a) through (e) of R.C. 2151.414(B)(1), "the court must find by clear and convincing evidence that the child either (a) cannot or should

not be placed with either parent within a reasonable period of time; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; or (d) has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period." *In re J.N.*, 2020-Ohio-4157, ¶ 26 (2d Dist.). If any of the aforementioned factors are satisfied, then the court must determine whether granting permanent custody is in the best interest of the child. *Id.*; R.C. 2151.414(B)(1).

{¶ 52} When making the best-interest determination, R.C. 2151.414(D)(1) provides the following factors for the trial court to consider:

(a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of R.C. 2151.414 apply in relation to the parents and child.

{¶ 53} "[A] court must consider 'all relevant factors,' including [the] five enumerated statutory factors, . . . . No one element is given greater weight or heightened significance." *In re C.F.*, 2007-Ohio-1104, ¶ 57, quoting *In re Schaefer*, 2006-Ohio-5513, ¶ 56. "Juvenile courts need not 'expressly discuss each of the best-interest factors,' and '[c]onsideration is

all the statute requires.'" (Bracketed text in original.) *In re H.V.F.*, 2024-Ohio-5838, ¶ 41 (2d Dist.), quoting *In re A.M.*, 2020-Ohio-5102, ¶ 31.

*Analysis*

**{¶ 54}** For the first part of its permanent custody analysis, the trial court found that the requisite ground for permanent custody under R.C. 2151.414(B)(1)(d) was satisfied, i.e., that the children were in the temporary custody of a public or private children services agency for 12 or more months of a consecutive 22-month period. Father does not dispute that finding, and the record establishes that the 12-month requirement under R.C. 2151.414(B)(1)(d) was in fact satisfied.[1] As previously discussed, Father only disputes the trial court's finding that granting MCCS permanent custody was in the best interest of the children. In reviewing this decision, we discuss each factor under R.C. 2151.414(D)(1).

a.      Children's Interaction and Interrelationship with Others

**{¶ 55}** The record indicates that A.W., C.W., S.W., D.W., and B.W. had not asked about Mother or Father nor did they wish to see them. At the time of the permanent custody hearing, the children had experienced little contact with Mother and Father for a period of almost two years. Mother and Father had not told the children that they were moving to Arkansas, nor had they said goodbye to the children when they left. Between May 2023 and December 2023, Mother and Father had some contact with R.W. over the phone, but they had no contact with the other children until H.W.'s funeral on December 8, 2023. After seeing

---

[1] Pursuant to R.C. 2151.414(B)(1), a child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated abused, neglected, or dependent or the date that is 60 days after the removal of the child from home. In this case, even when using the latter of the two dates, i.e., the dependency adjudication date of September 2, 2022, the 12-month time requirement is satisfied because the children had been in the temporary custody of MCCS for over 12 months when MCCS filed its motion for permanent custody on December 13, 2023.

the children at H.W.'s funeral, A.W., C.W., and S.W. resumed negative behaviors, such as tantrums and meltdowns, and they began wetting the bed as well. Prior to leaving for Arkansas, when Mother and Father visited the children at MCCS, the visits were sporadic. Mother and Father also had often shown up late or canceled visits at the last minute.

{¶ 56} In contrast, the children had bonded with their respective foster mothers, and they had a positive relationship with their foster siblings and their extended foster families. The two foster mothers were ensuring that the siblings saw each other at least once a month. The foster mothers planned fun activities for the children to do together such as bowling, Easter egg hunting, visiting parks, and eating meals together. The children also got to see R.W. regularly and talk with him on the phone.

{¶ 57} The record shows both foster mothers have a loving relationship with the children in their care, and they both want to adopt the children. R.W. has bonded with the owner of the group home where he has been placed. The owner indicated to MCCS that she might be willing to provide long-term care for R.W. and possibly adopt him sometime in the future when she is able to focus solely on him.


b.      Children's Wishes:

{¶ 58} The children were not interviewed by the trial court, but the GAL report filed on March 15, 2024, indicated that R.W. wished to live with his parents or Paternal Grandfather, and that the other children wished to remain in their foster placement.

c.      Custodial History:

{¶ 59} The children were removed from their parents' home on June 16, 2022. On June 23, 2022, MCCS received interim temporary custody of all the children except for R.W. R.W. was initially placed with a kinship caregiver while the other children were placed in

19

foster homes. After approximately one month, R.W.'s kinship caregiver decided that she no longer wanted to care for R.W. Interim temporary custody of R.W. was then granted to MCCS, and MCCS placed R.W. in a group home. On October 28, 2022, MCCS received temporary custody of all the children. On December 5, 2023, MCCS was granted a first extension of temporary custody. Except for R.W., all the children had been in MCCS's custody for the entire duration of the case and had been in the same foster homes that they were initially placed in. R.W. had been in various group homes and was at Dante's Peak at the time of the permanent custody hearing.

> d. Children's Need for Legally Secure Permanent Placement

{¶ 60} "While the Ohio Revised Code does not define a 'legally secure permanent placement,' Ohio courts have held that the phrase means 'a safe, stable, consistent environment where a child's needs will be met.'" *In re Z.A., A.A., Z.A.*, 2025-Ohio-5247, ¶ 23 (2d Dist.), quoting *In re K.M.*, 2023-Ohio-3203, ¶ 35 (4th Dist.). In this case, Mother and Father did not have stable housing. They were evicted from their home in April 2023 and then moved to Arkansas in June 2023 to live with family. Mother and Father also did not have stable and independent incomes. Although Mother and Father reported obtaining employment at fast-food restaurants, they failed to provide MCCS with verification of their employment.

{¶ 61} In addition to the aforementioned failures, Mother and Father had not addressed their ongoing substance abuse issues. They both failed to follow through with referrals for mental health and substance abuse assessments and failed to engage in mental health counseling. Although Father had entered a drug abuse inpatient facility a month prior to the permanent custody hearing and maintained his sobriety during that time, his case plan required him to maintain sobriety for six months. Aside from maintaining his sobriety for six

months, Father remained obligated to complete all his other case plan objectives before reunification was possible.

{¶ 62} Given that Mother and Father had not made any progress on their case plan, which required, among other things, for them to maintain stable housing, income, and sobriety, we find that they were not in a position to provide a safe, stable, and consistent environment where the children's needs would be met. Accordingly, the children were in need of a legally secure placement that could not have been achieved without granting permanent custody to MCCS.

e.    Applicable Factors in R.C. 2151.414(E)(7) through (11)

{¶ 63} "The factors in R.C. 2151.414(E)(7) through (11) . . . involve a parent's having been convicted of or pleaded guilty to specific criminal offenses against the child, the child's sibling or another child who lived in the parent's household; a parent's withholding medical treatment or food from the child; a parent's repeatedly placing the child at substantial risk of harm because of alcohol or drug abuse; a parent's abandoning the child; and a parent's having had parental rights as to the child's sibling involuntarily terminated." *A.M.*, 2020-Ohio-5102 at ¶ 19.

{¶ 64} The factor under R.C. 2151.414(E)(10), which involves the parents abandoning the child, is applicable in this case. Pursuant to R.C. 2151.011(C), "a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." In this case, the evidence established that Mother and Father had visited the children on May 15, 2023, left for Arkansas, and did not have any contact with the children until December 8, 2023. This amounts to 207 days in which Mother and Father had no contact with the children. Although Mother and Father had

21

some contact with R.W. over the phone, the record does not indicate how often they actually had contacted him. Accordingly, the criteria for abandonment was established as to all the other children, and possibly R.W. as well.

*Granting MCCS Permanent Custody Was in the Children's Best Interest*

{¶ 65} After reviewing the record and considering the best-interest factors under R.C. 2151.414(D)(1), we conclude that there was clear and convincing evidence supporting the trial court's finding that granting permanent custody to MCCS was in the best interest of the children. We also conclude that the best-interest finding was not against the manifest weight of the evidence. We disagree with Father's argument that the best interest of the children would have been better served by a second extension of temporary custody. Although Father was on track with his sobriety, his sobriety was just one aspect of his case plan. We also find it significant that it took Father a year and a half to take any action on his substance abuse problem and that he did virtually nothing until a month before the permanent custody hearing. While we commend Father in taking that action, the fact remains that Father was not remotely close to completing his case plan objectives.

{¶ 66} Father's third assignment of error is overruled.

**Second Assignment of Error**

{¶ 67} Under his second assignment of error, Father claims that the trial court's judgment granting MCCS permanent custody of his children should be reversed because Mother was not properly served with notice of the permanent custody hearing. For the reasons outlined below, Father's argument is not well taken.

{¶ 68} As a preliminary matter, we note that "[i]n permanent custody proceedings, when service of process upon a parent is defective, the juvenile court fails to acquire jurisdiction over that parent as required to terminate the parent's parental rights with respect

22

to his or her children." *In re Holloway*, 1996 WL 227481, *2 (12th Dist. 1996); *State ex rel. Ballard v. O'Donnell*, 50 Ohio St.3d 182, 183 (1990) ("'It is axiomatic that . . . a judgment rendered without proper service or entry of appearance is a nullity and void.'"), quoting *Lincoln Tavern*, *Inc. v. Snader*, 165 Ohio St. 61, 64 (1956).

{¶ 69} "R.C. 2151.414(A)(1) provides, in relevant part, that when a motion for permanent custody is filed, 'the court shall schedule a hearing and give notice of the filing of the motion and of the hearing, in accordance with section 2151.29 of the Revised Code, to all parties to the action and to the child's guardian ad litem.'" *In re J.C.S.*, 2023-Ohio-1511, ¶ 53 (2d Dist.), quoting R.C. 2151.414(A)(1). "'For proper service [under R.C. 2151.29], the parents must be notified of the permanent custody motion and the initial permanent custody hearing by one of three methods: personal service, service by certified or registered mail . . . , or—if both those methods fail—by publication.'" (Bracketed text in original.) *Id*. at ¶ 54, quoting *In re Keith Lee P.*, 2004-Ohio-1976, ¶ 8 (6th Dist.), citing R.C. 2151.29 and Juv.R. 16.

{¶ 70} "Service by publication "'is reserved for those cases in which the residence of the parent is unknown and is not ascertainable with reasonable diligence.'"" *Id*., quoting *In re J.T.*, 2019-Ohio-465, ¶ 38 (4th Dist.), quoting *In re R.P.*, 2012-Ohio-4799, ¶ 18 (9th Dist.). "It has been described as "'a method of last resort.'"" *Id*., quoting *J.T.* at ¶ 38, quoting *In re Miller*, 33 Ohio App.3d 224, 226, (8th Dist. 1986). With regard to service by publication, Juv.R. 16(A) provides, in relevant part, that

> [b]efore service by publication can be made, an affidavit of a party or party's counsel shall be filed with the court. The affidavit shall aver that service of summons cannot be made because the residence of the person is unknown

to the affiant and cannot be ascertained with reasonable diligence and shall set forth the last known address of the party to be served.

{¶ 71} In this case, MCCS filed an "Affidavit for Service by Posting" for the purpose of serving Mother with notice of the permanent custody hearing by publication as permitted by Juv.R.16(A). According to the affidavit, MCCS had attempted to serve Mother by certified mail to her last known address in Arkansas, but certified mail service had failed. MCCS also had received no forwarding address, and it had been unable to determine Mother's whereabouts despite conducting a diligent search for other addresses. Specifically, MCCS had attempted to locate Mother by consulting with Mother's relatives and by using various resources such as JusticeWeb, the Clear Due Diligence Program, and "MCSEA."

{¶ 72} At the permanent custody hearing, MCCS advised the trial court that service had been perfected on Mother by publication. Mother's counsel did not object to MCCS's assertion about Mother's service by publication. Mother's counsel and caseworker Bradley also confirmed that they had made Mother aware of the hearing date. At no point in time did Mother's counsel argue that Mother was not properly served with notice of the permanent custody hearing. Rather, that argument was raised by Father as part of his objections to the magistrate's decision—an argument which the trial court rejected.

{¶ 73} Father is now challenging the trial court's determination that Mother was properly served by publication. Father claims that service on Mother was defective because MCCS's affidavit—alleging that Mother's address was unknown and could not be ascertained by reasonable diligence—was false and did not comply with the law. In support of this claim, Father asserts that Mother's address was known to be that of Paternal Grandfather's in Arkansas. Father also asserts that MCCS failed to indicate why certified mail service on Mother was unsuccessful or whether it ever attempted to serve Mother by

24

ordinary mail as permitted by Civ.R. 4.6. Father further argues that the parties were never served with the affidavit.

**{¶ 74}** Significantly, Father is complaining of an alleged service error against Mother, not himself. "'Generally, an appellant does not have standing to argue issues affecting another person.'" *Dayton Lodge, L.L.C. v. Hoffman*, 2013-Ohio-5755, ¶ 35 (2d Dist.), quoting *Benjamin v. Ernst & Young, L.L.P.*, 2006-Ohio-2739, ¶ 4 (10th Dist.). "'However, an appellant may "complain of an error committed against a nonappealing party when the error is prejudicial to the rights of the appellant."'" *Id.*, quoting *Benjamin* at ¶ 4, quoting *In re Smith*, 77 Ohio App.3d 1, 13 (6th Dist. 1991).

**{¶ 75}** This court has addressed a situation where a mother claimed that a children services agency did not complete a diligent search before serving notice of the permanent custody hearing on the father by publication. *In re Shackelford*, 1990 WL 68954, *5 (2d Dist. May 22, 1990). The mother argued that had the father received proper notice of the permanent custody hearing and attended the hearing, there may have been a chance that the father or one of his relatives would have received custody of the child, which would have allowed her to see the child more often. *Id.*

**{¶ 76}** The record in *Shackelford* indicated that the father had seen the child only three or four times before the child was removed from the mother's care, had no contact with the children services agency, and had never made an effort to legally establish his paternity. *Id.* at *2-4. Under these circumstances, this court found that the possibility of the child being placed with the father or one of the father's relatives "was remote in the extreme." *Id.* at *6. The court also found that even if it were to assume that the children services agency could have made a greater effort to locate the father, the mother had failed to establish that she was prejudiced by the father being served by publication. *Id.* As a result, the court concluded

25

that the mother lacked standing to argue that the father was improperly served with notice of the permanent custody hearing. *Id.*

{¶ 77} Other appellate courts of this state have reached the same conclusion as *Shackelford* regarding standing. *See, e.g., In re Sours*, 1988 WL 81057, *2 (3d Dist. Sept. 27, 1988) (appellant mother lacked standing to object to a purported defect in service upon father where mother failed to point to any realistic possibility of prejudice to herself from the procedure followed by the juvenile court); *In re Jordan*, 2002 WL 121211, *7 (9th Dist. Jan. 30, 2002) (appellant mother lacked standing to raise alleged failure of service on father where mother failed to demonstrate that she was actually prejudiced by the alleged error); *In re Kincaid*, 2000 WL 1683456, *4 (4th Dist. Oct. 27, 2000); (appellant mother had no standing to raise the issue of the trial court's personal jurisdiction over the father when there is no evidence that her defense was prejudiced by the absence of the father from the proceedings).

{¶ 78} In this case, Father does not indicate how the alleged defective service on Mother prejudiced him. Like *Shackelford*, the possibility of Mother getting custody of the children was extremely remote. The record indicated that Mother accomplished even less than Father in completing her case plan objectives. Furthermore, even if MCCS could have made a greater effort to locate Mother, the record indicates that Mother was aware of the hearing date but simply chose not to attend. Because Father has failed to make any argument regarding how he was prejudiced by the alleged service error and because the record does not otherwise establish prejudice, Father lacks standing to raise the alleged service error in this appeal.

{¶ 79} Father's second assignment of error is overruled.

**First Assignment of Error**

**{¶ 80}** Under his first assignment of error, Father claims that the trial court's judgment granting MCCS permanent custody of the children should be reversed because R.W.'s and S.W.'s respective counsel provided ineffective assistance during the permanent custody hearing. We disagree.

**{¶ 81}** As a preliminary matter, we note that "pursuant to R.C. 2151.352, as clarified by Juv.R. 4(A) and Juv.R. 2(Y), a child who is the subject of a juvenile court proceeding to terminate parental rights is a party to that proceeding and, therefore, is entitled to independent counsel in certain circumstances." *In re Williams*, 2004-Ohio-1500, ¶ 29. "One of these circumstances is 'when the child has consistently and repeatedly expressed a strong desire that differs and is otherwise inconsistent with the guardian ad litem's recommendations.'" *In re D.M.*, 2019-Ohio-1497, ¶ 10 (3d Dist.), quoting *In re V.L.,* 2016-Ohio-4898, ¶ 39 (12th Dist.). Here, the trial court appointed counsel to R.W. and S.W. because they initially expressed a desire to be reunified with their parents that contradicted the GAL's recommendation.

**{¶ 82}** The State argues that Father does not have standing to assert that R.W.'s and S.W.'s counsel provided ineffective assistance. As previously discussed, an appellant may complain of an error committed against a nonappealing party only when the error is prejudicial to the rights of that appellant. *Dayton Lodge,* 2013-Ohio-5755 at ¶ 35 (2d Dist.); *Benjamin*, 2006-Ohio-2739 at ¶ 4 (10th Dist.); *Smith*, 77 Ohio App.3d at 13. "In the context of a permanent custody determination by the juvenile court, . . . when the interests of the parents are aligned with the interests of the child on the issue of reunification any error prejudicial to the children's interest in reunification is similarly prejudicial to the parents' interest." *In re A.E.,* 2021-Ohio-488, ¶ 63 (10th Dist.). "In such circumstances, the parents

27

would have standing to assert an assignment of error alleging that the minor child was denied effective legal counsel." *Id.*; *accord In re T.C.K.*, 2013-Ohio-3583, ¶ 14 (4th Dist.) ("a parent has standing to appeal an error committed against a child when the parent and the child seek the same outcome, i.e., reunification of the family"); *In re S.B.*, 2009-Ohio-3619, ¶ 16 (10th Dist.) ("'[a]ny error prejudicial to the children's interest in reunification is similarly prejudicial to the parents' interest,' giving the parents standing to assert error committed against the children"), quoting *Smith* at 13.

{¶ 83} The record indicates that at the time of the permanent custody hearing, the wishes of Father and R.W. were aligned with respect to reunification, as R.W. still wanted to be placed with his parents. Because Father's and R.W.'s interests were aligned, we find that Father has standing to assert an assignment of error alleging that R.W. was denied effective assistance of counsel at the permanent custody hearing. The same, however, cannot be said for Father's claim that S.W.'s counsel was ineffective. This is because the most recent GAL report filed before the permanent custody hearing indicated that S.W. wanted to stay in her foster placement. The testimony of S.W.'s foster mother supports this conclusion as well. Foster Mother testified that none of the children in her care had asked to see Mother or Father. Because at the time of the hearing S.W.'s interests no longer aligned with Father's interests, Father does not have standing to raise an ineffective assistance claim on S.W.'s behalf. Therefore, we address only Father's ineffective-assistance claim as it relates to R.W.'s counsel.

{¶ 84} "The test that is used for analyzing ineffective assistance of counsel claims in permanent custody cases is the same test that is used in criminal cases." *In re R.W.H.*, 2021-Ohio-4024, ¶ 77 (2d Dist.), citing *In re S.A.*, 2008-Ohio-2225, ¶ 8 (2d Dist.). "[T]o prevail on an ineffective-assistance-of-counsel claim, a defendant must prove that counsel's

28

performance was deficient and that the defendant was prejudiced by counsel's deficient performance." *State v. Davis*, 2020-Ohio-309, ¶ 10, citing *State v. Bradley*, 42 Ohio St.3d 136, 141-142 (1989), and *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Therefore, Father must show deficient performance by R.W.'s counsel and resulting prejudice. The failure to make a showing of either deficient performance or prejudice defeats a claim of ineffective assistance of counsel. *Strickland* at 697.

{¶ 85} To establish deficient performance, Father must show that counsel's performance fell below an objective standard of reasonable representation. *Id*. at 688. In evaluating counsel's performance, a reviewing court "must indulge in a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id*. at 689. "The adequacy of counsel's performance must be viewed in light of all of the circumstances surrounding the trial court proceedings." *State v. Jackson*, 2005-Ohio-6143, ¶ 29 (2d Dist.), citing *Strickland*.

{¶ 86} To establish prejudice, Father must show that there is "a reasonable probability that, but for counsel's errors, the proceeding's result would have been different." *State v. Hale*, 2008-Ohio-3426, ¶ 204, citing *Strickland* at 687-688 and *Bradley* at paragraph two of the syllabus. "'A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Bradley* at 142, quoting *Strickland* at 694.

{¶ 87} In reviewing ineffective assistance claims, we will not second-guess trial strategy decisions. *State v. Mason*, 82 Ohio St.3d 144, 157 (1998). "[T]he law is 'well settled that debatable trial tactics do not give rise to a claim for ineffective assistance of counsel.'" *In re S.W.*, 2024-Ohio-681, ¶ 43 (2d Dist.), quoting *In re Simon*, 2001 WL 651519, *2 (9th Dist. June 13, 2001), citing *State v. Clayton*, 62 Ohio St.2d 45, 49 (1980). Furthermore, "mere speculation cannot support either the deficient performance or prejudice requirement

29

of an ineffective-assistance claim." *State v. Morgan*, 2018-Ohio-3198, ¶ 16 (2d Dist.), citing *State v. Short*, 2011-Ohio-3641, ¶ 119, and *State v. Perez*, 2009-Ohio-6179, ¶ 217.

{¶ 88} In this case, Father claims that R.W.'s counsel provided ineffective assistance because counsel did nothing at the permanent custody hearing. Father argues that R.W.'s counsel did not request a continuance of the hearing, object to the alleged improper service on Mother, file any motions, call or cross-examine any witnesses, offer any evidence at the hearing, or make any statements to convey R.W.'s position. As a result of these failures, Father claims that counsel did not provide R.W. with an opportunity to be heard in a meaningful manner at the hearing.

{¶ 89} With regard to counsel's failure to request a continuance of the permanent custody hearing, the record establishes that on the day of the hearing, both Mother's and Father's counsel moved to continue the hearing due to Mother's absence and Father's desire to complete his substance abuse program. Under the trial court's local rules, motions for continuances must be made in writing no later than seven days before trial, and any motions made beyond that deadline may be granted only upon a showing of good cause. Montgomery C.P., Juv.Div., Loc.R. 16. Under the circumstances of this case, the trial court found that Mother's and Father's counsel had failed to show good cause for granting a continuance on the day of the hearing, and it denied their motions. Had R.W.'s counsel moved for a continuance on the same grounds, the trial court would have undoubtedly denied the motion for the same reason it denied Mother's and Father's. Accordingly, Father cannot establish any prejudice resulting from the failure of R.W.'s counsel to request a continuance. Even if there was a question as to whether the trial court would have granted R.W. a continuance, the trial court's decision on that matter is purely speculative, and mere

speculation cannot form the basis of an ineffective-assistance claim. *Short*, 2011-Ohio-3641 at ¶ 119; *Perez*, 2009-Ohio-6179 at ¶ 217.

{¶ 90} As for counsel's failure to object to the alleged improper service on Mother, we note that unlike Father, R.W. had standing to raise such an objection because it is arguable that Mother's failure to appear at the hearing hurt R.W.'s chances to be reunited with her and thus prejudiced him. However, there is no dispute that Mother had actual notice of the hearing date and that she had counsel representing her at the hearing. In addition, Mother's counsel did not object to MCCS's claim that Mother was served by publication. Under these circumstances, any objection by R.W.'s counsel as to service on Mother would have been unwarranted. *See In re C.B.*, 2014-Ohio-4618, ¶ 6-11 (9th Dist.) (no error where the mother had actual notice of the permanent custody hearing due to her counsel communicating the hearing date to her directly and where the mother's counsel appeared at the hearing and accepted service on her behalf). Counsel's failure to raise an unwarranted objection does not amount to deficient performance. *State v. Harwell*, 2015-Ohio-2966, ¶ 52 (2d Dist.). Accordingly, we cannot find that R.W.'s counsel provided ineffective assistance by failing to object to MCCS's service on Mother.

{¶ 91} Turning to counsel's failure to file motions, Father does not indicate what type of motions would have been appropriate for R.W.'s counsel to file or how the unspecified motions would have aided his and R.W.'s interests during the permanent custody hearing. Father cannot establish deficient performance simply by making a blanket assertion that counsel failed to file unspecified motions. *See In re Spence*, 2001 WL 298236, *5 (9th Dist. 2001) (court unable to find deficient performance on the part of counsel where appellant made a blanket assertion that his counsel was ineffective for failing to file unspecified motions). The same analysis applies to Father's claim that R.W.'s counsel failed to present

31

any witnesses or other evidence at the permanent custody hearing. Father does not specify what witnesses or evidence counsel should have presented at the hearing or how presenting the unspecified witnesses and evidence would have changed the outcome of the proceeding.

{¶ 92} Father also does not specify what questions R.W.'s counsel should have asked on cross-examination. Father's counsel, Mother's counsel, and the GAL all participated in the cross-examination of witnesses during the hearing. Therefore, it is possible that the questions posed by those counsel covered any questions that R.W.'s counsel may have had. We cannot find that R.W.'s counsel was deficient for failing to ask unspecified questions for which no prejudice can be attributed. The decision to call witnesses, cross-examine witnesses, or present evidence constitutes matters of trial strategy that this court will not second guess on appeal; "'[f]ailing to question witnesses on cross examination and choosing not to present witnesses fall within the realm of trial strategy.'" (Bracketed text in original.) *In re S.W.*, 2024-Ohio-681, ¶ 43 (2d Dist.), quoting *In re Riley*, 2003-Ohio-4109, ¶ 21 (4th Dist.).

{¶ 93} Lastly, in relation to counsel's failure to make any statements to convey R.W.'s position during the hearing, we find that it is purely speculative that any statement by counsel would have changed the trial court's permanent custody decision. The record establishes that the trial court was aware that R.W. wished to be reunited with his parents. The GAL noted that fact in her report, which was submitted as an exhibit during the hearing. Under the circumstances of this case, particularly Mother's and Father's continued failures to complete their case plan objectives, it is unlikely that the trial court's permanent custody decision would have been impacted by counsel's reiteration of R.W.'s wishes during the hearing. And again, whether it would have had an impact is mere speculation, which cannot

form the basis of an ineffective assistance claim. *Short*, 2011-Ohio-3641 at ¶ 119; *Perez*, 2009-Ohio-6179 at ¶ 217.

**{¶ 94}** Because Father has failed to show deficient performance on the part of R.W.'s counsel and resulting prejudice, his ineffective assistance claim fails.

**{¶ 95}** Father's first assignment of error is overruled.

### Conclusion

**{¶ 96}** Having overruled all three assignments of error raised by Father, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

EPLEY, P.J., and HUFFMAN, J., concur.