[Cite as *In re B.H.*, 2026-Ohio-1213.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MONTGOMERY COUNTY

IN RE: B.H.

:

:    C.A. No. 30654

:

:    Trial Court Case No. G-2021-004169-0Q

:

:    (Appeal from Common Pleas Court-Juvenile Division)

:

:    **FINAL JUDGMENT ENTRY & OPINION**

. . . . . . . . . . .

Pursuant to the opinion of this court rendered on April 3, 2026, the judgment of the trial court is affirmed.

Costs to be paid as stated in App.R. 24.

Pursuant to Ohio App.R. 30(A), the clerk of the court of appeals shall immediately serve notice of this judgment upon all parties and make a note in the docket of the service. Additionally, pursuant to App.R. 27, the clerk of the court of appeals shall send a certified copy of this judgment, which constitutes a mandate, to the clerk of the trial court and note the service on the appellate docket.

For the court,

_____
ROBERT G. HANSEMAN, JUDGE

TUCKER, J., and HUFFMAN, J., concur.

**OPINION**

MELISSA A. BERRY, Attorney for Appellant
MICHAEL P. ALLEN, Attorney for Appellee

HANSEMAN, J.

{¶ 1} Appellant ("Mother") appeals from a judgment of the Juvenile Division of the Montgomery County Common Pleas Court that granted permanent custody of her child, B.H., to the Montgomery County Department of Job and Family Services, Children Services Division ("MCCS"). Mother challenges the sufficiency and manifest weight of the evidence underlying the judgment. Mother also claims her counsel provided ineffective assistance, thus violating her Sixth Amendment right under the United States and Ohio Constitutions. For the reasons that follow, the judgment of the trial court is affirmed.

**I. Facts and Course of Proceedings**

{¶ 2} At the time of B.H.'s birth on May 11, 2021, the child had symptoms of drug withdrawal that required additional hospitalization before discharge to Mother. Approximately two months later, on August 13, 2021, Mother called emergency services reporting mental health issues and a fear of drug abuse relapse. Mother was hospitalized, and B.H. was taken to her maternal grandmother, who also had addiction problems. MCCS became involved with B.H. and filed a dependency complaint on September 22, 2021. Once MCCS was granted interim temporary custody of B.H., the child was placed with her great-grandmother. On November 29, 2021, B.H. was adjudicated dependent, and MCCS placed B.H. in foster care due to great-grandmother's age and medical issues.

{¶ 3} MCCS created a case plan for Mother, which required her to complete substance abuse and mental health treatment, comply with random drug testing, sign

2

releases of information, maintain safe, adequate housing, complete parenting classes and a parenting psychological evaluation, follow up with all recommendations related to the psychological evaluation, attend weekly supervised visitations with B.H., and attend all scheduled medical appointments for B.H.

{¶ 4} For a period of time, Mother maintained sobriety, continued with mental health services, obtained employment, attended supervised visits with B.H., and otherwise performed well on her case plan. A year after B.H. was adjudicated dependent, on November 17, 2022, MCCS filed a motion to have Mother reunified with B.H. with MCCS to maintain protective supervision. After receiving interim temporary custody of B.H. in January 2023, Mother relapsed on illegal substances, and MCCS was granted temporary custody of B.H.

{¶ 5} One month later, on April 3, 2023, Mother received interim temporary custody of B.H. again. However, MCCS received reports that Mother was leaving B.H. alone in her apartment. On April 8, 2023, Mother was found naked and locked out of her apartment, and she refused to cooperate with law enforcement. B.H. was located inside of Mother's apartment alone on the floor. Mother was admitted to a hospital, where she acknowledged using methamphetamine. MCCS filed another motion for temporary custody on April 13, 2023, and the trial court granted the motion on May 9, 2023. At that time, B.H. was approximately two years old. The child was placed with a new foster family, J.S. and C.S.

{¶ 6} Mother's case plan with MCCS remained the same. She was required to continue with mental health and substance abuse treatment, maintain sobriety, complete a parenting class, maintain suitable housing and income, and have weekly supervised visits with B.H. MCCS's primary goal was to reunite B.H. with Mother. As a secondary concurrent

3

goal if Mother failed to meet her case plan objectives, MCCS identified adoption as a possibility.

{¶ 7} In September 2023, Mother had a meeting with her MCCS caseworker, during which she was under the influence of illegal substances. Mother threatened the caseworker with physical harm. Also in September, Mother had an altercation with staff members at a methadone clinic and was arrested for disorderly conduct. Mother admitted to abusing heroine and methamphetamine. As a result, MCCS suspended Mother's supervised visits with B.H. until she could demonstrate her commitment to sobriety and provide three clean drug tests.

{¶ 8} On December 28, 2023, MCCS filed its motion for permanent custody of B.H. The trial court initially scheduled the hearing for March 20, 2024; however, the hearing was continued to October 1, 2024. During the time leading up to the final hearing, MCCS continued to work with Mother. But Mother did not maintain sobriety and became homeless around April 2024.

{¶ 9} At the October 1, 2024 permanent custody hearing, Mother did not appear, but her attorney was present. MCCS called two witnesses: Mother's MCCS caseworker and J.S. The caseworker testified about his involvement with Mother since B.H. was adjudicated dependent in November 2021. The caseworker described Mother as inconsistent with her case plan. The caseworker told the court that when Mother was compliant with her case plan, she was not abusing illegal drugs. When Mother was noncompliant with her case plan, she admitted to the caseworker that she had relapsed.

{¶ 10} The caseworker also testified about Mother's drug abuse treatment history. Mother had engaged with seven different agencies. At every treatment provider, Mother began treatment and did well for a short time, but she was eventually terminated from

4

treatment. Each termination was an incomplete termination due to either Mother's voluntarily termination to seek alternative treatment or Mother's continuing drug use and missed appointments.

{¶ 11} Regarding Mother's visits with B.H., the caseworker testified that Mother had supervised visitations suspended in September 2023. The caseworker explained he required three clean drug screens from Mother to reinstate visitation. In July 2024, Mother attended two visits with B.H. The caseworker described Mother's attitude during the visits as aggressive and confrontational. The caseworker also believed that Mother attended the visits under the influence. Due to Mother's impairment, the caseworker again suspended visits in August 2024.

{¶ 12} The caseworker also described seeking alternative placement for B.H. Placement with Mother's relatives was not an option, though. Mother's grandparents could not provide long-term care for B.H. due to age- and health-related issues. Mother's uncle was interviewed but refused to be a placement option. B.H.'s father was unknown.

{¶ 13} As to B.H.'s placement with J.S. and C.S., the caseworker testified that J.S. and C.S. were a foster-to-adopt placement. The caseworker described J.S and C.S. as very loving and testified that B.H. was bonded with them.

{¶ 14} At the time of the October 1, 2024 hearing, the caseworker was not able to confirm Mother's current treatment due to her failure to sign releases of information. Mother had also refused to allow the caseworker into her rooming house near a homeless shelter. As a result, the caseworker could not testify as to whether Mother's current housing was suitable for B.H. The caseworker also believed Mother was unemployed and receiving monthly disability income.

**{¶ 15}** J.S. also testified at the October 1, 2024 permanent custody hearing. J.S. confirmed that B.H. was doing well in her care and that she and her husband wanted to adopt B.H. J.S. testified that B.H. called her "mommy" and her husband "daddy." J.S. stated that B.H. was generally a very happy child and had been developing normally. J.S. testified that B.H. was very bonded with her and her husband and that B.H. was also bonded with her extended family as well, including her sister, brother-in-law, and three nieces.

**{¶ 16}** Regarding contact with Mother, J.S. stated that she and her husband had set up an email account so that Mother could contact them regarding B.H. Mother never asked them anything regarding B.H., except on one occasion where her husband responded by sending Mother photographs of B.H. J.S. also described B.H.'s behavior after the two visits with Mother in July 2024. J.S. indicated that after B.H. had contact with Mother, B.H. got emotional, cried, and pushed J.S. away. B.H. needed to be held and consoled. J.S. described B.H.'s behavior as very emotional, and it lasted for a few consecutive days.

**{¶ 17}** When the evidence of MCCS's case was completed, counsel for Mother did not present evidence or witnesses. Mother's counsel told the court that he had spoken with Mother regarding her case in the past. Counsel also indicated that the last communication he had with Mother was around July 2024, during which Mother asked about the next scheduled court date. Counsel stated that he emailed Mother the court date, called her, and left a voicemail. Counsel told the court that he had no communication from Mother since his correspondence and voicemail.

**{¶ 18}** The recommendation of the guardian ad litem ("GAL") at the hearing was for MCCS to be granted permanent custody of B.H. The magistrate filed a written decision granting permanent custody to MCCS on November 20, 2024. Two days later, on November 22, 2024, Mother filed her initial objections to the magistrate's decision. After a transcript of

6

the hearing was prepared, her objections were supplemented by new counsel on March 17, 2025. Mother's former counsel withdrew to preserve all appealable issues for Mother.

{¶ 19} On September 22, 2025, the trial court filed its written decision overruling each of Mother's objections to the magistrate's decision. After conducting a de novo review, the trial court determined that B.H. had been in MCCS's care over twelve months of a twenty-two-month period of time and that permanent custody to MCCS was in B.H.'s best interests. The trial court concluded that MCCS had made reasonable efforts to reunite B.H. with Mother. It found that due to Mother's sporadic and inconsistent progress with her case plan, it was impossible to safely return B.H. to Mother's care in a reasonable time. This appeal followed on October 10, 2025.

## II. Mother's Assignments of Error

Mother raises two assignments of error.

**First Assignment of Error**

**THE TRIAL COURT ERRED IN ADOPTING THE MAGISTRATE'S DECISION GRANTING PERMANENT CUSTODY TO THE AGENCY, WHICH WAS NOT SUPPORTED BY SUFFICIENT EVIDENCE AND WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

**Second Assignment of Error**

**TRIAL COUNSEL WAS INEFFECTIVE, CAUSING A VIOLATION OF MOTHER'S SIXTH AMENDMENT RIGHT TO COUNSEL.**

## III. Sufficiency and Manifest Weight of the Evidence

{¶ 20} Mother's first assignment of error claims that the trial court's decision granting permanent custody of B.H. to MCCS was not supported by sufficient evidence and was against the manifest weight of the evidence. MCCS contends the trial court's decision should

7

be reviewed for abuse of discretion. Appellee's Brief, p. 4. Because the proper standard of review must be applied, we address this issue first.

### Standard of Review

{¶ 21} On December 27, 2023, the Supreme Court of Ohio resolved a conflict among the district courts of appeals regarding the proper standard of review when an appellate court reviews a trial court's decision awarding permanent custody. *In re Z.C.*, 2023-Ohio-4703, ¶ 18. The Court held that "the proper appellate standards of review to apply in cases involving a juvenile court's decision under R.C. 2151.414 to award permanent custody of a child and to terminate parental rights are the sufficiency-of-the-evidence and/or manifest-weight-of-the-evidence standards." *Id*. Since *Z.C.*, appellate review of a judgment terminating parental rights pursuant to R.C. 2151.414 has not been reviewed under the abuse of discretion standard. *Id*.

### Sufficiency of the Evidence

{¶ 22} The sufficiency of the evidence and manifest weight of the evidence standards are "distinct concepts and are '"both quantitatively and qualitatively different."'" *Id*. at ¶ 13, quoting *Eastley v. Volkman*, 2012-Ohio-2179, ¶ 10, quoting *State v. Thompkins*, 78 Ohio St.3d 380, 386 (1997), paragraph two of the syllabus. The sufficiency of the evidence standard is a "'test of adequacy,'" whereas "weight of the evidence '"is not a question of mathematics, but depends on its *effect in inducing belief*."'" (Emphasis in original.) *Id*., quoting *Thompkins* at 386-387, quoting *Black's Law Dictionary* (6th Ed. 1990). "'Whether the evidence is legally sufficient to sustain a verdict is a question of law.'" *Id*., quoting *Thompkins* at 386. "When applying a sufficiency-of-the-evidence standard, a court of appeals should affirm a trial court when the evidence is legally sufficient to support the jury verdict [or trial court's decision] as a matter of law." (Cleaned up.) *Id*.

### Manifest Weight of the Evidence

{¶ 23} "But 'even if a trial court judgment is sustained by sufficient evidence, an appellate court may nevertheless conclude that the judgment is against the manifest weight of the evidence.'" *Z.C.* at ¶ 14, quoting *Eastley* at ¶ 12. "When reviewing for manifest weight, the appellate court must weigh the evidence and all reasonable inferences, consider the credibility of the witnesses, and determine whether, in resolving conflicts in the evidence, the finder of fact clearly lost its way and created such a manifest miscarriage of justice that the judgment must be reversed and a new trial ordered." *Id*. "'In weighing the evidence, the court of appeals must always be mindful of the presumption in favor of the finder of fact.'" *Id*., quoting *Eastley* at ¶ 21. "Judgments supported by some competent, credible evidence going to all the essential elements of the case will not be reversed by a reviewing court as being against the manifest weight of the evidence." *C. E. Morris Co. v. Foley Const. Co.*, 54 Ohio St.2d 279 (1978), syllabus.

### Permanent Custody Under R.C. 2151.414

{¶ 24} We acknowledge that a parent has a "fundamental liberty interest" in the care, custody, and management of his or her child and an "essential" and "basic civil right" to raise his or her children. *Santosky v. Kramer*, 455 U.S. 745, 753 (1982); *In re Murray*, 52 Ohio St.3d 155, 157 (1990); *accord In re D.A.*, 2007–Ohio–1105, ¶ 8-9. However, a parent's fundamental rights are not absolute. *D.A.* at ¶ 11. Rather, "'it is plain that the natural rights of a parent . . . are always subject to the ultimate welfare of the child, which is the polestar or controlling principle to be observed.'" *In re Cunningham*, 59 Ohio St.2d 100, 106 (1979), quoting *In re R.J.C.*, 300 So.2d 54, 58 (Fla.App. 1974). Thus, the state may terminate parental rights when a child's best interest demands such termination. *D.A.* at ¶ 11.

{¶ 25} R.C. 2151.414 governs the termination of parental rights in Ohio. "[I]f a child has been in the temporary custody of one or more public children services agencies or private child placing agencies for twelve or more months of a consecutive twenty-two-month period, the agency with custody shall file a motion requesting permanent custody of the child." R.C. 2151.413(D)(1). After a hearing, trial courts must apply a two-part test as outlined in R.C. 2151.414(B)(1) to determine whether to grant a motion for permanent custody to a public children services agency. The statute requires the trial court to find, by clear and convincing evidence, that (1) any one of the factors enumerated in R.C. 2151.414(B)(1)(a) through (e) exist and that (2) an award of permanent custody to the agency is in the best interest of the child. R.C. 2151.414(B)(1).

{¶ 26} "Clear and convincing evidence is that measure or degree of proof which is more than a mere 'preponderance of the evidence,' but not to the extent of such certainty as is required 'beyond a reasonable doubt' in criminal cases, and which will produce in the mind of the trier of facts a firm belief or conviction as to the facts sought to be established." *Cross v. Ledford*, 161 Ohio St. 469 (1954), paragraph three of the syllabus.

### Factors of R.C. 2151.414(B)(1)(a) Through (e)

{¶ 27} With regard to the factors under (a) through (e) of R.C. 2151.414(B)(1), the court must find by clear and convincing evidence that the child either (a) cannot or should not be placed with either parent within a reasonable period of time; (b) is abandoned; (c) is orphaned and no relatives are able to take permanent custody of the child; (d) has been in the temporary custody of one or more public or private children services agencies for 12 or more months of a consecutive 22-month period; or (e) the child or another child in the custody of the parent or parents from whose custody the child has been removed has been adjudicated an abused, neglected, or dependent child on three separate occasions by any

10

court in this state or another state. R.C. 2151.414(B)(1)(a) through (e). "If any of the aforementioned factors are satisfied, then the court must determine whether granting permanent custody is in the best interest of the child." *In re A.W.*, 2025-Ohio-5657, ¶ 51 (2d Dist.), citing *In re J.N.*, 2020-Ohio-4157, ¶ 26 (2d Dist.), and R.C. 2151.414(B)(1).

**{¶ 28}** Of relevance in this case, the trial court found clear and convincing evidence that B.H. had been in the temporary custody of MCCS for 12 or more months of a consecutive 22-month period pursuant to R.C. 2151.414(B)(1)(d).

### Twelve or More Months of a Consecutive 22-Month Period

**{¶ 29}** "[A] child shall be considered to have entered the temporary custody of an agency on the earlier of the date the child is adjudicated pursuant to section 2151.28 of the Revised Code or the date that is sixty days after the removal of the child from home." R.C. 2151.414(B)(1)(e).

**{¶ 30}** In the trial court's decision, the trial court determined that the date B.H. was adjudicated dependent (November 29, 2021) was the date that B.H. entered the temporary custody of MCCS. The trial counted the total months up to the date when MCCS filed its motion for permanent custody (December 28, 2023). The trial court then found that B.H. had been in the temporary custody of MCCS for 20 months. Upon review, the trial court correctly calculated the total time B.H. had been in the temporary custody of MCCS. *In re C.W.*, 2004-Ohio-6411, ¶ 26 ("[B]efore a public children-services agency or private child-placing agency can move for permanent custody of a child on R.C. 2151.414(B)(1)(d) grounds, the child must have been in the temporary custody of an agency for at least 12 months of a consecutive 22–month period. In other words, the time that passes between the filing of a motion for permanent custody and the permanent-custody hearing does not count toward the 12–month period set forth in R.C. 2151.414(B)(1)(d).").

**{¶ 31}** Additionally, the brief time B.H. was reunified with Mother does not change the calculation. According to the Supreme Court of Ohio, "R.C. 2151.414(B)(1)(d) simply requires 12 or more months of temporary custody within a consecutive 22-month period. Nothing in R.C. 2151.414(B)(1)(d) requires 22 months of agency involvement before the agency seeks permanent custody." *In re N.M.P.*, 2020-Ohio-1458, ¶ 22.

**{¶ 32}** "To meet the statutory requirement that a child be in the custody of a children-services agency for 12 or more months of a consecutive 22-month period, the child might have been placed in the agency's custody for one continuous period or the child might have been placed in the agency's custody, removed from the agency's custody, and then returned to the agency's custody." *Id*. at ¶ 23. In *N.M.P.*, the child had been reunified with the parent for approximately two months, but the child had been in the temporary custody of the agency for over 18 months. Similarly in this case, though Mother had brief reunification with B.H. between January 2023 and April 2023, MCCS had temporary custody of B.H. for 20 months between November 2021 and December 2023, as the trial court determined. Therefore, the satisfaction of R.C. 2151.414(B)(1)(d) was supported by clear and convincing evidence. The trial court's determination regarding this factor was not against the manifest weight of evidence or based on insufficient evidence.

### *Best Interest Factors Under R.C. 2151.414(D)(1)*

**{¶ 33}** When making the best-interest determination, R.C. 2151.414(D)(1) provides the following factors for the trial court to consider:

> (a) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster caregivers and out-of-home providers, and any other person who may significantly affect the child;

12

(b) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;

(c) The custodial history of the child;

(d) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency;

(e) Whether any of the factors in divisions (E)(7) to (11) of R.C. 2151.414 apply in relation to the parents and child.

R.C. 2151.414(D)(1)(a) through (e).

{¶ 34} "'[A] court must consider "all relevant factors," including [the] five enumerated statutory factors . . . . No one element is given greater weight or heightened significance.'" *In re A.W.*, 2025-Ohio-5657, ¶ 53 (2d Dist.), quoting *In re C.F.*, 2007-Ohio-1104, ¶ 57, quoting *In re Schaefer*, 2006-Ohio-5513, ¶ 56. "'Juvenile courts need not "expressly discuss each of the best-interest factors," and "[c]onsideration is all the statute requires."'" (Bracketed text in original.) *Id.*, quoting *In re H.V.F.*, 2024-Ohio-5838, ¶ 41 (2d Dist.), quoting *In re A.M.*, 2020-Ohio-5102, ¶ 31.

{¶ 35} In reviewing the trial court's decision, the trial court analyzed all the statutory factors contained in R.C. 2151.414(D).

### a. Child's Interaction and Interrelationship with Others

{¶ 36} In its decision, the trial court considered B.H.'s relationship with J.S. and C.S. and noted that B.H. was bonded with them and their extended family, which included an aunt, three cousins, and a grandparent—C.S.'s mother who frequently provided childcare for B.H. The trial court also noted that J.S. and C.S. allowed regular contact and visits with Mother's grandparents.

{¶ 37} Although the trial court noted Mother's lack of visits with B.H. since September 2023, with the exception of two visits in July 2024, the trial court did not specifically state in its written decision that it considered Mother's relationship with B.H. Despite the trial court's failure to articulate more in its decision regarding Mother's relationship with B.H., it had ample evidence before it regarding Mother's relationship with B.H. Mother cites the GAL report in her appellate brief to point out that she was also bonded with B.H. Yet from the testimony of J.S. and the caseworker, the trial court heard that after B.H. had two supervised visits with Mother in July 2024, B.H. was emotional and would sometimes cry and need comforted for days immediately after each visit. The trial court also heard testimony regarding Mother's lack of email correspondence with J.S. and C.S., which demonstrated an absence of interest or effort on Mother's part regarding B.H. Given the evidence before the trial court, there was sufficient credible evidence for the court to conclude that this factor did not weigh in Mother's favor.

### b. Child's Wishes

{¶ 38} Due to B.H.'s young age of five years old at the time of the permanent custody hearing, neither the GAL nor MCCS interviewed B.H. regarding her wishes. Thus, the trial court could not consider this factor. Even if B.H. had been interviewed and expressed a desire to be with Mother, this factor would not have been dispositive of B.H.'s best interests.

### c. Custodial History

{¶ 39} In the trial court's decision, the court articulated B.H.'s custodial history in MCCS's temporary custody that began in August 2021, two months after B.H.'s birth, up to the permanent custody hearing on October 1, 2024. The custodial history of B.H. spanned the course of the child's life. The trial court included Mother's brief period of interim temporary custody in January 2023, which resulted in MCCS taking temporary custody back

for approximately a month, as well as a second period in April 2023 during which Mother was granted reunification. The trial court noted that Mother's reunification was brief, and due to Mother's ongoing substance abuse and mental health, MCCS had received temporary custody again. We conclude the trial court properly weighed this factor against Mother.

### d. The Child's Need for Legally Secure Permanent Placement

{¶ 40} The Ohio Revised Code does not define the term "legally secure permanent placement"; however, the word "secure" means "free from fear, care, or anxiety," "affording safety," "trustworthy, dependable," "strong, stable, or firm enough to ensure safety," and "capable of being expected or counted on with confidence." *Webster's Third New International Dictionary* (1966). "A legally secure permanent placement is more than a house with four walls. Rather, it generally encompasses a stable environment where a child will live in safety with one or more dependable adults who will provide for the child's needs." *In re M.B.*, 2016-Ohio-793, ¶ 56 (4th Dist.). R.C. 2151.414(D)(1)(d) describes the factor as the child's need for the legally secure placement and whether it can be accomplished without granting permanent custody to an agency.

{¶ 41} The trial court concluded that B.H. needed a legally secure permanent placement and that the only way this could be achieved was to grant permanent custody to MCCS. In its decision, the trial court considered J.S. and C.S.'s willingness to adopt B.H. Additionally, the caseworker testified at the hearing that J.S. and C.S.'s home was "stable," indicating a home that B.H. could trust in and rely on. Comparing Mother's home, though the court had evidence that Mother maintained the same two-bedroom apartment for years, the court also had evidence that prior to the hearing, Mother was homeless and that while staying at a rooming house near the homeless shelter, she had not allowed her caseworker to enter the residence. Given Mother's lack of cooperation with her caseworker, at the time

15

of the hearing, the court had no evidence to suggest that Mother was able to provide a suitable home for B.H., let alone a stable one that B.H. could trust in and rely on. The court further heard testimony from the caseworker that he had considered Mother's relatives as placements, but none of them was an option for B.H. Given the evidence before the trial court, the trial court appropriately weighed this factor against Mother.

### e. Any Other Relevant Factors Contained in R.C. 2151.414(E)(7) Through (11)

{¶ 42} Though most of the factors in R.C. 2151.414(E)(7) through (11) are not relevant to this matter, the trial court considered R.C. 2151.414(E)(10), which concerns cases in which "the parent has abandoned the child." R.C. 2151.011(C) provides that "[f]or the purposes of [R.C. Ch. 2151], a child shall be presumed abandoned when the parents of the child have failed to visit or maintain contact with the child for more than ninety days, regardless of whether the parents resume contact with the child after that period of ninety days." We have held the presumption of abandonment is a rebuttable presumption. *In re Custody of C.E.*, 2005-Ohio-5913, ¶ 12 (2d Dist.).

{¶ 43} The trial court's decision noted that Mother had two visits with B.H. in July 2024 and that prior to then, she had not visited since September 2023. Although in her appellate brief Mother blames her caseworker for suspending her visits, the trial court properly applied the statutory definition of abandonment. The trial court's statutory finding was based on sufficient evidence and was not against the manifest weight of evidence. This factor did not weigh in Mother's favor.

### Case Plan Compliance

{¶ 44} In addition, Mother argues that she completed most of the requirements of her case plan. Mother appears to argue that completion of the plan, if determined, should tilt the

scale of the analysis of the best interests of the child in her favor. Mother's argument is unpersuasive.

{¶ 45} The trial court specifically found that Mother did not complete her case plan requirements as she lost suitable housing, repeatedly failed to maintain sobriety, failed to sign releases of information to verify treatment or random drug screen results, and otherwise failed to correct the circumstances that had caused B.H.'s removal. Based on our review of the evidence, the trial court had sufficient evidence to conclude that Mother did not complete her case plan.

{¶ 46} Even if we were to conclude that Mother completed her case plan, a parent's case plan progress is not dispositive of what is in the best interests of the child. *In re T.S.*, 2017-Ohio-482, ¶ 12 (2d Dist.). "'[A] parent's case plan compliance, while it may be relevant to a best interest analysis, does not automatically override a trial court's decision regarding what is in a child's best interests.'" *In re T.D.*, 2016-Ohio-7245, ¶ 12 (2d Dist.), quoting *In re M.B.*, 2016-Ohio-793, ¶ 59 (4th Dist.). "This court has recognized that '[w]hen the focus is on the child's best interest, a trial court conceivably could terminate parental rights even if a parent completed all of her case-plan objectives.'" *T.S.* at ¶ 12, quoting *T.D.* at ¶ 12 (2d Dist.), citing *M.B.*

***Reasonable Efforts to Prevent Removal or to Ensure Child's Return Home***

{¶ 47} Mother also argues that MCCS failed in its reasonable efforts to prevent B.H.'s removal and that the trial court's determination that MCCS made such reasonable efforts was not supported by sufficient evidence and was against the manifest weight of the evidence. We are not persuaded by Mother's argument.

{¶ 48} R.C. 2151.419(A)(1) requires a trial court to determine at any hearing held pursuant to R.C. 2151.353 "whether the public children services agency . . . that filed the

complaint in the case, removed the child from home, has custody of the child, or will be given custody of the child has made reasonable efforts to prevent the removal of the child from the child's home, to eliminate the continued removal of the child from the child's home, or to make it possible for the child to return safely home." R.C. 2151.419(A)(1). The agency has the burden of proving that it has made reasonable efforts. *Id*. "In determining whether reasonable efforts were made, the child's health and safety shall be paramount." *Id*.

{¶ 49} R.C. Chapter 2151 does not define "reasonable efforts," but the term has been construed to mean "[t]he state's efforts to resolve the threat to the child before removing the child or to permit the child to return home after the threat is removed." *C.F.*, 2007-Ohio-1104, at ¶ 28 (2d Dist.). We have defined the term to mean "'a good faith effort which is "an honest, purposeful effort, free of malice and the desire to defraud or to seek an unconscionable advantage." The issue is not whether [the Agency] could have done more, but whether it did enough to satisfy the "reasonableness" standard under the statute.'" *In re N.M.*, 2016-Ohio-318, ¶ 54 (2d Dist.), quoting *In re S.F.*, 2013-Ohio-508, ¶ 21 (2d Dist.), quoting *In re Secrest*, 2002-Ohio-7096, ¶ 13 (2d Dist.). By contrast, we have stated that "'"[r]easonable efforts" does not mean all available efforts. Otherwise, there would always be an argument that one more additional service, no matter how remote, may have made reunification possible.'" *Id*. at ¶ 53, quoting *In re K.M.*, 2004-Ohio-4152, ¶ 23 (12th Dist.). *Accord In re C.O.*, 2015-Ohio-4290, ¶ 43 (2d Dist.).

{¶ 50} The trial court had sufficient, credible evidence to conclude MCCS made reasonable efforts to return B.H. back to Mother. There were seven different substance abuse treatment providers for Mother over the course of three years. Mother was also provided referrals for mental health, parenting classes, supervised visitations, regular home visits by MCCS, and contact information for B.H.'s foster parents. MCCS even

recommended reuniting Mother and B.H. in 2023. Despite MCCS's efforts, it was Mother's repeated and continuous substance abuse, combined with her mental health, that prevented B.H. from being returned to her safely.

{¶ 51} Accordingly, the trial court's permanent custody award to MCCS was based on sufficient evidence and was not against the manifest weight of evidence. Mother's first assignment of error is overruled.

### IV. Mother's Claim of Ineffective Assistance of Trial Counsel

{¶ 52} Mother's second assignment of error claims that trial counsel was ineffective, violating her Sixth Amendment right to counsel.

{¶ 53} A parent's right to counsel arises from the guarantees of due process and equal protection contained in the constitutions of Ohio and the United States, *State ex rel. Heller v. Miller*, 61 Ohio St.2d 6 (1980), paragraph two of the syllabus, as well as Juv.R. 4(A) and R.C. 2151.352 ("the child's parents or custodian . . . is entitled to representation by legal counsel at all stages of the proceedings under this chapter or Chapter 2152. of the Revised Code"). "That right to counsel includes the right to the effective assistance of trial counsel." *In re S.A.*, 2008-Ohio-2225, ¶ 8 (2d Dist.). "The test for ineffective assistance of counsel used in criminal cases is equally applicable to actions seeking the permanent, involuntary termination of parental custody." *Id*.

{¶ 54} To prevail on an ineffective assistance of counsel claim, a party must establish that (1) trial counsel's performance was deficient and (2) the deficient performance caused prejudice. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Bradley*, 42 Ohio St.3d 136 (1989), paragraph two of the syllabus. In order to prove deficient performance, a defendant must show that "counsel's performance fell below an objective standard of reasonable representation." *Strickland* at 688. To establish prejudice, "[t]he defendant must

19

show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

{¶ 55} "The defendant or petitioner has the burden of proof on the issue of ineffective assistance of counsel, as licensed attorneys in Ohio are presumed to be competent." *State v. Southern*, 2018-Ohio-4886, ¶ 47 (2d Dist.), citing *State v. Calhoun*, 86 Ohio St.3d 279, 289 (1999). "Trial counsel is entitled to a strong presumption that all decisions fall within the wide range of reasonable professional assistance." *In re J.J.*, 2006-Ohio-6151, ¶ 29 (10th Dist.), citing *State v. Sallie*, 81 Ohio St.3d 673, 675 (1998).

{¶ 56} After reviewing the record, we find no evidence of deficient performance or prejudice. Mother argues that counsel failed to prepare for the hearing and advocate for her interests. But counsel made objections to the caseworker's testimony during the hearing and asked questions on cross-examination. Mother also alleges that counsel was deficient for failing to present evidence. However, the decision not to present a witness or certain evidence falls within the realm of trial strategy and does not give rise to a claim for ineffective assistance of counsel. *In re S.W.*, 2024-Ohio-681, ¶ 43 (2d Dist.).

{¶ 57} Mother also claims that counsel failed to communicate with her and inform her of when the hearing was scheduled. The record establishes that counsel informed the trial court that he sent Mother an email and left her a voicemail regarding the hearing in July 2024. Counsel did not receive communication back from Mother before the hearing on October 1, 2024.

{¶ 58} The record also shows that counsel moved to withdraw after receiving the magistrate's decision granting permanent custody to MCCS. Counsel's rationale was to protect Mother's interest for the purpose of filing objections. Mother subsequently objected

and filed the instant appeal as well. For all these reasons, Mother's argument is without merit. Mother's second assignment of error is overruled.

**V. Conclusion**

**{¶ 59}** Having overruled Mother's two assignments of error, the judgment of the trial court is affirmed.

. . . . . . . . . . . . .

TUCKER, J., and HUFFMAN, J., concur.